STATE OF CONNECTICUT *v.* BURNEST FREENEY
(14537)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and LAVERY, Js.

Argued September 29, 1993—decision released February 22, 1994

*Elizabeth M. Inkster,* assistant public defender, with whom, on the brief, was *Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James G. Clark,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Burnest Freeney, was convicted by a jury of two counts of kidnapping in the first degree, in violation of General Statutes

§§ 53a-92 (a) (2) (A) and 53a-8,[1] two counts of sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a)[2] and 53a-8, and one count of assault in the third degree in violation of General Statutes § 53a-61.[3] He was sentenced by the trial court to concurrent ten year terms on the kidnapping counts, a concurrent one year term on the count of third degree assault, a concurrent term of eighteen years on the first sexual assault count and a consecutive term of twelve years on the second sexual assault count for a total effective sentence of thirty years. He has appealed directly to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant raises four issues: (1) whether his conviction of two counts of kidnapping in the first degree violated the prohibition against double jeopardy contained in the Connecticut and United States constitutions; (2) whether the trial

[1] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-70 provides in relevant part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] General Statutes § 53a-61 provides: "ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon."

court abused its discretion by admitting expert testimony regarding the reaction of assault victims to sexual and physical abuse; (3) whether the trial court abused its discretion by refusing to charge the jury that an inference other than guilt could be drawn from evidence of flight in light of the fact that the defendant was on parole; and (4) whether the trial court abused its discretion by excluding testimony that the defendant had waived his *Miranda*[4] rights and had denied kidnapping and participating in the sexual assault of the victim.

Because the defendant's conviction and sentencing on the second count of kidnapping in the first degree violated his right against double jeopardy, we reverse the trial court's judgment as to that count. With respect to the remaining counts, we affirm the judgment of the trial court.

The facts leading up to the defendant's arrest and convictions can be summarized briefly as follows. On March 28, 1991, at approximately 11:30 p.m. the victim went to the home of her friend, Denise, where she met the defendant for the first time. As the victim was leaving Denise's home, the defendant asked if he could buy her a drink and she accepted. The two walked to a section of New Haven known as the "Mudhole," where the defendant purchased wine and beer at a bar. They then went back to the victim's one room apartment, which was on the third floor of a three-story building. Approximately one hour after the two had arrived at her apartment, during which time the defendant had ingested cocaine, the victim asked the defendant to leave. The defendant, however, refused to do so. He became hostile, struck the victim repeatedly and told her she was going to be his "bitch" and prostitute for him. The defendant then grabbed the vic-

---

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

tim's keys from her apartment door and ordered her to wear his gold chain that held a gold letter "B" to indicate she was his "bitch," or prostitute.

The defendant and victim thereafter went outside, where the defendant ordered the victim to open her coat to display her body. At one point he yelled, "$10, 15, 20—one way, round trip, get anything you want," to a group passing by on bicycles. The defendant and the victim eventually arrived at a house near the "Mudhole" where several men paid the defendant to have oral and vaginal sex with the victim in the backyard. Subsequently, while the defendant was distracted, the victim attempted to leave but two men grabbed her and yelled to the defendant that his "bitch" was trying to get away. The defendant slapped her and then took her back to her apartment.

At the victim's apartment, the defendant attempted to have intercourse with the victim. When the victim tried to dissuade him, the defendant exclaimed: "you're my prostitute, you do what I say." After sexually molesting but failing to have intercourse with the victim, the defendant locked her in her room, took her keys and left. The victim screamed but did not open the window to seek help from outside. She eventually fell asleep.

One hour later, at approximately 6 a.m., the defendant returned to the victim's apartment with an older man who, after paying the defendant $7, had sexual intercourse with the victim. Thereafter, the defendant escorted the man out and left the victim locked in her apartment for approximately one and one-half hours. The record does not indicate what the victim did during that period.

Later, at approximately 10 a.m., the defendant brought the victim back to the "Mudhole," where he again ordered her to expose herself to some men in the

area. While there, the victim saw her friend Denise, who asked her if anything was wrong. The victim replied "nothing." Denise then told the defendant that the victim was coming with her but the defendant pulled the victim to him and replied that she was not going anywhere. The defendant struck the victim, causing her to bleed, and took her back to her apartment. Soon after the defendant and the victim had returned to the victim's apartment, Denise arrived. The victim managed to talk to Denise alone in the bathroom where she asked Denise to divert the defendant's attention so that she could escape. As the defendant accompanied Denise to the front door to see her out, the victim ran barefoot out the back door to a neighbor's house and called the police.

## I

The defendant argues, and the state concedes, that the defendant's conviction and sentencing for the second count of kidnapping violates the prohibition against double jeopardy contained in the United States constitution[5] and the Connecticut constitution.[6] "The proper double jeopardy inquiry when a defendant is convicted of multiple violations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute. *Albernaz* v. *United States,* 450 U.S. 333, 337, 101 S. Ct. 1137, 67 L. Ed.

---

[5] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." The constitutional provision prohibiting double jeopardy is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland,* 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[6] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." The due process guarantees of article first, § 9, include protection against double jeopardy. *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).

2d 275 (1981); *Whalen* v. *United States,* 445 U.S. 684, 691, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)." (Emphasis in original.) *State* v. *Rawls,* 198 Conn. 111, 121, 502 A.2d 374 (1985).

Section 53a-92 (a) (2) (A) makes it an offense to "[*abduct*] another person and . . . (2) . . . [to restrain] the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ." (Emphasis added.) Once the victim had been abducted and restrained with the requisite intent, common sense dictates that the defendant could not have abducted her again unless at some point she had become free of his control. "Because kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." *State* v. *Gomez,* 225 Conn. 347, 351, 622 A.2d 1014 (1993), citing *State* v. *Jefferies,* 304 S.C. 141, 145, 403 S.E.2d 169 (1991) and *State* v. *Dove,* 52 Wash. App. 81, 88, 757 P.2d 990 (1988). Kidnapping is a continuing crime. *State* v. *Smith,* 198 Conn. 147, 155, 502 A.2d 874 (1985).

Because the facts clearly demonstrate that the victim was continually restrained after her abduction and was abducted with only one intent, to violate or abuse her sexually, the defendant committed only one crime of kidnapping. The state and the defendant agree that his conviction and punishment for the second count of kidnapping violated his right against double jeopardy. We concur.

Under the circumstances, the proper remedy to cure the double jeopardy violation is to set aside the defendant's conviction and his sentence for the second count of kidnapping. Contrary to the state's view, the remedy is not to merge the convictions into a single conviction and vacate only the sentence for the second conviction. This case is not analogous to *State* v. *Chicano,* 216 Conn. 699, 584 A.2d 4254 (1990), cert.

denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). In *Chicano,* where the defendant was convicted of greater and lesser included offenses resulting in a double jeopardy violation, we combined the convictions of the greater and lesser included offenses and vacated only the sentences for the lesser included offenses. We reasoned that if the convictions for the greater offenses of felony murder were later invalidated for any reason that did not affect the convictions of the lesser included offenses of manslaughter in the first degree, the manslaughter convictions could be "resuscitated and the defendant could be punished for those convictions." Id., 725.

Unlike *Chicano,* where the convictions of the greater and lesser offenses were justified by the facts, in the present case the facts surrounding the commission of the continuing crime of kidnapping supported only a single conviction of kidnapping as that crime is defined by our statutes. In *Chicano,* the presence of a factual basis for conviction of the lesser included offenses of manslaughter justified the continued vitality of the defendant's convictions of those offenses. In the present case, no other valid conviction can be combined with the remaining conviction of kidnapping so as to be "resuscitated" in the event of a later invalidation of that conviction.

We conclude that where there are multiple convictions of the *same* crime arising from a single continuing incident, the proper remedy, when there is a consequential double jeopardy violation, is the setting aside of both the surplus conviction and the penalty ascribable to it.

II

The defendant next claims that the trial court abused its discretion by allowing the state improperly to bolster the victim's testimony by presenting experts to

testify that her disjointed, sparse version of the events given immediately after the incident and her behavior during her ordeal were not inconsistent with that of assault victims. We disagree.

The state presented two experts who testified that victims of physical and sexual abuse manifest common patterns of behavior. The first expert was Craig Newton, a social worker and codirector of the victimology program at the Yale-New Haven Hospital emergency room, and an instructor at the Yale School of Medicine of courses in stress management and sexual assault protocol. Newton had questioned the victim when she had first been admitted into the emergency room at Yale-New Haven Hospital on March 29, 1991. He testified that it is not unusual for assault victims, in the early stages of their admission into the hospital, to be unable to recount the details of the trauma that brought them there, and that such victims often recount events out of chronological order. Newton further testified that it is common for victims subsequently to recall information that they did not remember immediately after the assault.[7]

The state also presented testimony by Barbara Moynahan, a psychotherapist and professor of nursing, who founded the victimology program at Yale-New Haven Hospital. In response to hypothetical questions posed

---

[7] Newton's testimony was as follows:

"Q. Is it common to have someone in the early stages of their admission to your hospital, as was this victim, is it common for that person not to be able to tell you all the details of the event that brought them there?

"A. Yes.

"Q. Okay. Is it common for them to tell you, what it is that they tell you, out of chronological sequence?

"A. Yes.

"Q. . . . And is it common for portions of the events to come to them at a later time as they proceed through the trauma and the recovery from the trauma?

"A. Very common."

by the state, Moynahan testified that it would be consistent with her experience in working with victims for a woman who had been sexually assaulted to walk down a public street in the company of her assailant without calling out for help because she may fear the assailant. Moynahan also testified that it would be consistent with her experience for a victim of sexual assault who had been locked in a room by her assailant to go to sleep as an emotional "coping mechanism," rather than screaming out the window and risking that her cries might be overheard by her assailant.

Expert testimony should be admitted when: "(1) the witness has a special skill or knowledge directly applicable to a matter in issue,[8] (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." *State* v. *Rodgers,* 207 Conn. 646, 651, 542 A.2d 1136 (1988); *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986). We review claims of improper admission of expert testimony under an abuse of discretion standard. *State* v. *Kemp,* supra; *State* v. *Girolamo,* 197 Conn. 201, 214, 496 A.2d 948 (1985); *State* v. *Biller,* 190 Conn. 594, 617, 462 A.2d 987 (1983).

The present case is controlled by our recent decision in *State* v. *Borrelli,* 227 Conn. 153, 629 A.2d 1105 (1993). In *Borrelli,* before trial the victim gave the police a written sworn statement that she had been tied up and sexually abused by the defendant. She later contradicted her statement at trial. Id., 158–59. To explain her inconsistent testimony, the state presented an expert, Evan Stark, a sociologist, who testified that battered women will often recant earlier accusations in an attempt to mend their relationship with the batterer. Id., 168. On appeal, the defendant argued that

---

[8] There is no claim that the experts were not qualified to testify, and the substance of their testimony was never challenged at trial or on appeal.

Stark's testimony should not have been admitted. We concluded, however, that "Stark's expert testimony was properly admitted to assist the jury in understanding, not whether [the victim] was a credible witness on the witness stand, but whether her conduct . . . was consistent with the pattern and profile of a battered woman. . . . [T]he expert testimony did not invade the province of the jury in determining the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) Id., 174.

The present case is indistinguishable from *Borrelli.* At trial, the victim testified that the defendant had restrained her, had repeatedly beat her, and had forced her to engage in intercourse with strangers. The psychology of a victim of such abuse, is "in all likelihood . . . beyond the jury's experience and knowledge." Id., 173–74 (explanations for why a victim of sexual abuse would recant accusation are outside jury's experience); see also, *State* v. *Spigarolo,* 210 Conn. 359, 378, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989) (trauma experienced by minor victims of sex abuse is "beyond the understanding of the average person").

The sole purpose of the experts' testimony was to establish that the victim's behavior was generally consistent with that of a victim of sexual or physical abuse. The distinction between testimony about the general behavior of victims and an opinion as to whether the instant victim is telling the truth is critical. See *State* v. *Borrelli,* supra, 173 ("there is a 'critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility' "), quoting *State* v. *Spigarolo,* supra, 379. In this instance, neither expert gave an opinion as to whether this particular victim had told the truth or whether she had in fact suffered physical or sexual

abuse. The expert testimony that a victim of sexual or physical abuse might not necessarily attempt to escape, and might recount the circumstances of the abuse in a disjointed fashion, could have assisted the jury substantially in determining the central issue in the case—whether the defendant had restrained and assaulted the victim against her will. Accordingly, we conclude that the admission of the expert testimony was within the trial court's discretion.

### III

The defendant next claims that the trial court improperly instructed the jury that evidence of the defendant's flight could be used to infer consciousness of guilt, because the trial court did not also inform the jury that an inference other than consciousness of guilt could be drawn from that evidence. Specifically, the defendant claims that the court should have informed the jury that such evidence could have had an innocent explanation because the defendant was on parole and was avoiding the police for that reason. We disagree.

The trial court instructed the jury that "[f]light, when unexplained, can indicate consciousness of guilt if the facts and the circumstances support it. Flight may be proven by efforts of the police to locate the defendant, that proof must be supported by either direct or inferential evidence that the defendant knew he was wanted by the police. Evidence that members of the defendant's family knew he was being sought or that he failed to report to work following the alleged crimes have been found sufficient to infer flight by the defendant."

The flight instruction given by the trial court is consistent with our case law. "We have stated: [f]light, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or

explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration." (Citation omitted; internal quotation marks omitted.) *State* v. *Holloway,* 209 Conn. 636, 651–52, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). "The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous." *State* v. *Wright,* 198 Conn. 273, 281, 502 A.2d 911 (1986). Moreover, "[t]he court was not required to enumerate all the possible innocent explanations offered by the defendant." Id. While the court's charge on flight might have included a reference to the fact that the defendant was on parole and the inferences that could be drawn therefrom, we cannot say that the trial court's refusal to charge the jury to that effect was improper.

## IV

Finally, the defendant argues that the trial court abused its discretion by excluding testimony that, after he was apprehended, the defendant waived his *Miranda* rights and admitted that he struck the victim but denied kidnapping her or participating in sexual assaults upon her. The defendant claims that such evidence should have been admitted under the state of mind exception to the hearsay rule, in order to demonstrate that there were reasons, other than the defendant's guilty state of mind about the kidnapping and sexual assault of the victim, for the defendant to avoid the police. We disagree.

At trial, the defendant attempted to elicit from the arresting officer that the defendant had in fact waived his *Miranda* rights and had freely answered all of the officer's questions. The defendant also sought to introduce the substance of his statement wherein he had

admitted only that he had struck the victim. When the state objected, the defendant argued that he wanted to admit the evidence to demonstrate that "there may have been other reasons, mainly that he was in violation of the law . . . for him avoiding the police." The court sustained the state's objections.

The defendant's statements after his arrest are inadmissible hearsay and may not be offered to demonstrate his state of mind before his arrest. Statements by an accused "*after the act,* stating the *past intent or motive* at the time of the act" are inadmissible under the state of mind exception to the hearsay rule. (Emphasis in original.) 6 J. Wigmore, Evidence (4th Ed. Chadbourn Rev. 1976) § 1732 (4); see also *State* v. *Cato,* 21 Conn. App. 403, 408, 574 A.2d 240, cert. denied, 215 Conn. 874, 576 A.2d 547 (1990) ("[a]n out-of-court statement made after the completion of a criminal act is not admissible under the state of mind exception as to the intent or motive underlying that completed act"), citing 6 J. Wigmore, supra, and *General Motors Acceptance Corp.* v. *Capitol Garage, Inc.,* 154 Conn. 593, 227 A.2d 548 (1967). In the present case, the defendant sought to introduce postarrest statements that he had committed an assault but not a kidnapping or a sexual assault to indicate that he had fled from the police because he had struck the victim. Such statements do not fall within the state of mind exception to the hearsay rule.

The defendant argues that our decision in *State* v. *Jones,* 205 Conn. 723, 730, 535 A.2d 808 (1988), supports his claim of admissibility. In *Jones,* we concluded that out-of-court threats against the defendant by the victim's family could be admitted to explain why the defendant fled from the police. Id., 731. The present case is readily distinguishable. Whereas *Jones* involved statements made by a third party before the defendant's arrest, which would have impacted on the defend-

ant's state of mind prior to the arrest, the present case involves the defendant's postarrest statements regarding his own state of mind prior to the arrest. The trial court did not abuse its discretion in excluding the defendant's statements in this case.

The judgment of the trial court is affirmed except with respect to the second count of kidnapping; with respect to that count, the case is remanded to the trial court with direction to render judgment of not guilty thereon and to vacate the defendant's conviction and sentence therefor.

In this opinion PETERS, C. J., BORDEN and LAVERY, Js., concurred.

BERDON, J., dissenting. Although I agree with part I of the majority opinion, I disagree with the court's conclusions that the hypothetical questions asked of the expert on rape trauma syndrome were properly admitted and that the defendant was not entitled to his requested jury instruction on consciousness of guilt.

I

### EXPERT TESTIMONY

The majority misreads our decisions in *State* v. *Borrelli*, 227 Conn. 153, 629 A.2d 1105 (1993), and *State* v. *Spigarolo*, 210 Conn. 359, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). In doing so, it places this court's seal of approval on testimony that invades an exclusive province of the jury by bolstering the credibility of the complaining witness.

The trial court overruled the defendant's objection to the expert testimony of psychotherapist Barbara Moynahan, and she was permitted to answer hypothetical questions that tracked the testimony of the complaining witness. Moynahan was directed to assume that the details of the questions were established, and

then she was asked if each individual reaction of the victim was "consistent with a typical reaction to physical and sexual assault trauma." Moynahan answered that each individual reaction of the victim as set out in the hypothetical questions was indeed "consistent" with a typical victim reaction.[1] While Moynahan never directly testified that the victim in this case was a credible witness, the inevitable effect of her testimony was

[1] The following is the relevant portion of Barbara Moynahan's testimony on direct examination by the state's attorney.

"Q. Assume that a woman has taken a walk with and had drinks with a casual male acquaintance who turns suddenly violent against that woman, physically violent against that woman without warning. Assume that that acquaintance is physically much larger than the woman, assume that that acquaintance hits and threatens her and issues her orders telling her that she belongs to him, or words to that effect at this point, and she's to do what he says.

"Would it be consistent with the patterns of behavior associated with physical and sexual assault trauma for the woman to walk down the street, a public street in the company of this man and for her not to call out for help or try to flee?

"A. Yes, it would be very consistent with someone—

"Q. And why would someone behave that way?

"A. Because the threat of continued violence is there based on the fact that she's in the company of the person who inflicted this abuse upon her and, therefore, that fear and terror is enough to control her behavior.

"Q. And is that kind of behavior seen regularly in victims that fit that hypothetical?

"A. Yes, it's consistent with them, survival strategies.

"Q. Separate hypothetical now. Again, assume these facts.

"Assume that the woman has been periodically hit and threatened by a physically stronger man for an extended period of time, meaning hours, that she has been forced to display her body in public to strangers, that she's been sexually assaulted repeatedly and in front of a group of between eight and twelve men and then that she is locked in a small room with no available means of escape, no obvious exit, for several hours while the man is not in the room, but she doesn't know where he's gone.

"Would it be consistent with typical reactions to physical and sexual assault trauma for that woman to, first, go to sleep while she was locked in the room?

"A. That would be consistent because she has been subjected to experiences that are outside of the range of usual life experience and, therefore,

to vouch for the credibility of the victim's story, and therefore vouch for the credibility of the victim herself.

The court states that admission of this testimony is compelled by our decisions in *State* v. *Borrelli,* supra, and *State* v. *Spigarolo,* supra. We never went this far in either of those cases. In both cases, we pointed out that experts can only testify in generalities, based on their clinical observations of victims of abuse. In *State* v. *Borrelli,* supra, 173, we pointed out that the expert "did not comment, directly or indirectly, on [the victim's] credibility." Furthermore, we stated in *State* v. *Spigarolo,* supra, 379, that there is a "critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular

does not have the coping mechanisms to deal with that and would, in order to survive, begin to shut down, and one of the strategies that people resort to when they're shutting down might be to fall asleep.

"Q. Okay. Would it also be consistent with a typical reaction to physical and sexual assault trauma if she didn't open a window that was available there and screamed and yelled out the window for help?

"A. That is very consistent and would not be perceived by her to be an option since she had no idea about where the individual was who was violent to her, who had inflicted this trauma.

"Q. Now, I'd like to add some facts to that second hypothetical, the one you've just been addressing, additional facts added to what you've already heard.

"Assume that the man returns to this room, opens it, orders the woman back out onto a public street and takes her to an area which is within one hundred feet of where the sexual assaults occurred, that the people on the street in that area are a group of male strangers and that he remains no further than twenty feet from the woman at any one time.

"Would it be consistent with typical reactions to physical and sexual assault trauma for the woman to speak with a friend who approached her in that location, a female friend, to appear outwardly normal and to say nothing about the sexual or physical abuse to that friend in that location?

"A. That is very consistent with victim behavior. She could not rely on her friend to rescue her. The milieu in which she was currently involved with was consistent with a hostile environment, a threatening environment and she was not—it would not be unusual for her to not want to take a chance that her attempt at rescue would fail and she would be further victimized."

victim's credibility." We have *not,* prior to the present case, upheld, when raised as an issue, expert testimony that related a behavioral syndrome to the specific facts of a prosecution's case through the use of a hypothetical question.[2] See *State* v. *Borrelli,* supra, 164–65 (expert "did not apply any scientific test to a hypothetical question posed by the state"). Such testimony inevitably vouches for the credibility of the victim,[3] crossing the line between the permissible and the impermissible.

[2] In *State* v. *Christiano,* 228 Conn. 456, 637 A.2d 382 (1994), we recently upheld the use of hypothetical questions concerning delays by victims in reporting sexual abuse. The defendant in *Christiano,* however, never objected to these questions, but instead objected to the expert testimony generally on the ground that it was based on child sexual abuse accommodation syndrome. I concurred in *Christiano,* noting the following: "I merely wish to point out that the defendant did not object to the hypothetical questions posed to the expert witness Sidney Horowitz by the state, and Horowitz repeatedly indicated that his opinion was based upon his personal clinical experience and not upon his observation of the victim." *(Berdon, J.,* concurring) Id., 475.

[3] Under our precedents, the permissible purpose of social framework testimony is to rebut an impeachment of the victim by the defense that relies on common misconceptions about victims of abuse. Therefore, in *State* v. *Spigarolo,* 210 Conn. 359, 556 A.2d 112 (1989), the defense had impeached the credibility of two child sexual abuse victims by cross-examining them on "inconsistencies and incomplete disclosures the children had made to police and others prior to and during the official investigation of the alleged incidents." Id., 377. "Under these circumstances, we [held] that the trial court did not abuse its discretion in permitting [the expert] to testify that it is *not unusual* for sexually abused children to give inconsistent or incomplete accounts of the alleged incidents." (Emphasis added.) Id. We clearly delineated the limited purpose of the testimony. "This variety of expert testimony is admissible because the consequences of the unique trauma experienced by minor victims of sexual abuse are matters beyond the understanding of the average person." Id., 378. Similarly, the purpose of the battered woman's syndrome testimony in *State* v. *Borrelli,* 227 Conn. 153, 168–71, 629 A.2d 1105 (1993), was to dispel some common misconceptions about how a woman might react if she were abused by a batterer. The expert in that case "did not offer any opinion as to whether [the victim] . . . exhibited the typical behavioral characteristics of a battered woman." Id., 164.

The Supreme Court of Arizona drew this important distinction between permissible and impermissible purposes in *State* v. *Moran,* 151 Ariz. 378, 380–86, 728 P.2d 248 (1986). In *Moran,* the court upheld testimony regarding the general characteristics of sexual abuse victims, but rejected testimony that the victim's behavior was consistent with sexual abuse having occurred. The court first made clear that experts *"may not* give an opinion of the credibility of a particular witness." (Emphasis in original.) Id., 385. The court then noted that testimony regarding consistency "is slightly different than direct testimony on the victim's veracity. However . . . the inference offered the jury is that because this victim's personality and behavior are consistent with a molest having occurred, the crime must have been committed. . . . This type of particularized testimony permits the expert to indicate how he or she views the credibility of a particular witness. Once the jury has learned the victim's behavior from the evidence and has heard experts explain why sexual abuse may cause delayed reporting, inconsistency, or recantation, *we do not believe the jury needs an expert to explain that the victim's behavior is consistent or inconsistent with the crime having occurred."* (Citation omitted; emphasis added.) Id.

Other courts have also drawn the line at general characteristics testimony. In *State* v. *Svihl,* 490 N.W.2d 269, 273 (S.D. 1992), the court noted the following: "The expert in this case did not testify as to whether or not in her opinion [the victim] was testifying truthfully. The problem in this specific case is that the State did not limit its questions to characteristics, but solicited responses to the supposed hypothetical questions which invited an opinion on whether or not [the victim] exhibited traits and behaviorism of a sexually abused child. . . . The better practice would be to limit the expert testimony to such traits and charac-

teristics." The majority upheld the conviction, however, on the basis of harmless error and improperly preserved error. Id., 274. A dissenting opinion found the error to be properly preserved and harmful: "A prosecutor is not to go into the specifics of the facts and relate the rape trauma syndrome to the set of facts before the court. General characteristics testimony, yes. Details related to the scenario at hand, with conclusions, no." (Henderson, J., dissenting) Id., 275; see also *Commonwealth* v. *Dockham*, 405 Mass. 618, 628, 542 N.E. 2d 591 (1989) (upholding expert testimony on general characteristics of children who have been sexually abused where the expert "made no references or comparison to the child witness. See *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 175–76 [1983] [expert testimony about rape trauma syndrome held admissible where expert witness did not testify that victim in case had been raped or that she displayed behavior consistent with syndrome.]").

Based on the reasoning of these authorities, I believe that the use of a hypothetical question that tracks the evidence in a case is an impermissible use of "social framework" expert testimony. By allowing the expert to relate the facts of the case to the syndrome through the use of hypothetical questions, a court risks that the jury may make the improper inference that the expert's experience with a large number of victims would lead the expert to believe this victim. By creating the possibility of such an inference, the testimony impermissibly invades the province of the jury. In discussing battered woman's syndrome, one commentator noted: "If the victim's behavior, either directly or through the use of a hypothetical, is asserted to be consistent with the behavior of battered women, the jury may well assume that the expert believes that the victim was battered." J. Schroeder, "Using Battered Woman Syn-

drome Evidence in the Prosecution of a Batterer," 76 Iowa L. Rev. 553, 580 (1991).

Finally, I note that expert evidence of this type, directly affecting credibility and therefore going to the heart of the jury system, must be cautiously received. We must not allow the expert's testimony to supplant the fact-finding function of the jury. Accordingly, when requested, specific instructions *related directly to the particular expert,* in appropriate language, should be given to the jurors, and should include the following: that the expert testimony is merely to aid them; that they are free to accept or reject the testimony; that the expert's testimony is based on the expert's observation of a number of victims, serving the limited purpose of indicating that certain patterns of behavior are not uncommon among victims; that the testimony was *not* provided for the purpose of inferring that the crime charged had occurred; that, even if the jury accepts the testimony of the expert, it need not find that the syndrome has any application to the facts of the case; that ultimately the credibility of the complaining witness must be determined by the jury based solely on the facts of the case as the jury finds them to be.

## II

### CONSCIOUSNESS OF GUILT

I agree with the defendant that the trial court was obligated to instruct the jury that his flight could have had an innocent explanation because he was on parole and could have been avoiding the police for that reason.

At the outset, it is helpful to review the basis for this jury instruction. I presume it has roots in the biblical admonishment that "[t]he wicked flee, even when no man pursueth; but the righteous are bold as a lion." Proverbs 28:1 (King James). The instruction is premised on "the inference from *guilty conduct* to the

*commission of the guilty deed"* but we are cautioned that "there is ample room for [an] erroneous inference . . . ." (Emphasis in original.) 2 J. Wigmore, Evidence (3d Ed. 1940) p. 106; see also *Wong Sun* v. *United States,* 371 U.S. 471, 483 n.10, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) ("[w]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime"). "[I]n many situations, the inference of consciousness of guilt of the particular crime is so uncertain and ambiguous and the evidence so prejudicial that one is forced to wonder whether the evidence is not directed to punishing the 'wicked' generally rather than resolving the issue of guilt of the offense charged." 2 C. McCormick, Evidence (4th Ed. 1992) p. 182. Indeed, a number of jurisdictions have begun to question the use of flight instructions, and some have disapproved of it.[4] I leave this broader issue for another day because it was not raised at trial nor before this court.

In determining whether to admit and instruct the jury concerning evidence of flight, the trial court must weigh the prejudicial effect of this evidence against its probative value. *State* v. *Burak,* 201 Conn. 517, 533, 518 A.2d 639 (1986); *State* v. *Bell,* 188 Conn. 406, 412–13, 450

---

[4] See, e.g., *United States* v. *Robinson,* 475 F.2d 376, 384 (D.C. Cir. 1973) ("[t]he interest of justice is perhaps best served if this matter is reserved for counsel's argument, with little if any comment by the bench"); *People* v. *Larson,* 194 Colo. 338, 342, 572 P.2d 815 (1977) (expressing disfavor with a flight instruction "because it gives undue influence to one item of evidence"); *State* v. *Wrenn,* 99 Idaho 506, 508 and n.1, 584 P.2d 1231 (1978) (listing jurisdictions) ("because of the debatable significance of flight as evidence of guilt, an instruction on flight should not ordinarily be given"); *State* v. *Marsh,* 392 N.W.2d 132, 133 (Iowa 1986); *State* v. *Stilling,* 285 Or. 293, 305, 590 P.2d 1223, cert. denied, 444 U.S. 880, 100 S. Ct. 169, 62 L. Ed. 2d 110 (1979) ("in all future trials instructions on the significance of flight should not be given"); *State* v. *Grant,* 275 S.C. 404, 407, 272 S.E. 2d 169 (1980) (listing jurisdictions) ("henceforth . . . the judge [should] decline any charge whatsoever on [flight]"); *State* v. *Reed,* 25 Wash. App. 46, 50, 604 P.2d 1330 (1979) (while evidence of flight is admissible, it "should not be the subject of an instruction").

A.2d 356 (1982). In reviewing the instruction, it is critical that we distinguish between immediate flight from the crime scene, and flight that is inferred, as in the present case, from the fact that the police were seeking the defendant. See 2 C. McCormick, supra, p. 183. Flight from the scene of the crime—for example, where the victim is shot and the defendant is seen running from the crime scene immediately after the shooting—has a relatively high degree of probative value. On the other hand, flight or concealment from the police long after the crime is committed would generally appear to have little or no probative value. "[W]hen there is no immediacy between the flight and the crime, the court must be certain there is evidence that a defendant knows he is being sought for the specific crime charged and not some other crime or event." *United States* v. *Howze,* 668 F.2d 322, 325 (7th Cir. 1982).

The precise issue raised by the defendant in this case is whether the trial court, in giving the consciousness of guilt instruction, was also required to instruct the jurors that there could have been a reason other than guilt of the crime charged for the alleged flight. In making this determination, we must look at the *entire* instruction on the issue of consciousness of guilt in the context in which it was given in this case. "It is well established . . . that the individual instructions are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jury in guiding them to the proper verdict . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson,* 212 Conn. 31, 37, 561 A.2d 897 (1989).

The trial court first instructed the jury that the state has the burden of producing sufficient evidence to prove the defendant's guilt, and that the evidence includes "not only the testimony of the witnesses and the exhibits which were admitted into evidence, but also any rea-

sonable inferences that [the jury] can draw from the evidence." Thereafter, the trial court instructed the jury as follows: "Now, the law of our State recognizes a principle known as consciousness of guilt. Certain conduct of a person may be considered by you to show a guilty knowledge or consciousness of guilt. When a person is on trial for a criminal offense it is proper to show that . . . conduct [of that person] subsequent to the alleged criminal offense . . . may fairly [be claimed] to have been influenced by that act. Flight, when unexplained, can indicate consciousness of guilt if the facts and the circumstances support it. Flight may be proven by efforts of the police to locate the defendant, [but] that proof must be supported by either direct or inferential evidence that the defendant knew he was wanted by the police. Evidence that members of the defendant's family knew he was being sought or that he failed to report to work following the alleged crimes [has] been found sufficient to infer flight by the defendant. The State has offered evidence in this case that the defendant left work suddenly on April 5, 1991, shortly after the police had gone to his home with a warrant and had told his wife that he was wanted and that he left work, I think, without punching out. Further, they've offered evidence that he did not return to work that night, that he neither went to work as scheduled on April 6th, [nor] did he call in; that on April 7th, 1991, he sent his wife to pick up his check for the first time in his eight month service with that company, and that he did not turn himself in when his supervisor suggested it and that he did not open the door to the police when they came to the house on the morning of April 7th, 1991, at around 10:30 in the morning and announced who they were and knocked on the door. Now, if you find that the defendant did flee or did hide from the police following the commission of the crimes alleged, [then] you may find that such actions tend to

show a guilty connection with the crimes. *In other words, any action of the defendant following the alleged criminal act which you find shows a guilty knowledge influenced by the criminal act itself may be used by you as circumstantial evidence of the defendant's guilt.* That is, if you find that the defendant's acts or flight show consciousness of guilt, you may use that conclusion as *independent evidence of guilt* along with the other facts of the case to determine whether he has been proven guilty of the crimes charged." (Emphasis added.)

The consciousness of guilt charge was followed by a reference to constancy of accusation evidence.[5] The trial court then instructed the jury that it should consider all of the evidence, including circumstantial evidence, in determining guilt or innocence.

It is clear that the substance of the trial court's jury instruction as it pertains to the crime charged is as follows: *flight = consciousness of guilt = wrongdoing = guilt of the crime charged.* Although the constitutionality of the wording of the particular charge given by the trial court in this case is questionable because it diluted the burden of proving each element of the crime beyond a reasonable doubt, the defendant does not make this claim before us and, accordingly, I do not reach that issue.

I agree with the defendant that, under the circumstances of this case, the trial court was required to instruct the jury that there could be other reasons for the defendant's flight. The federal courts have adopted the following standard and, at the very least, so should we. "[A]n instruction [on flight as it might relate to consciousness of guilt] may be used only 'sparsely' and only if the trial judge accompanies it with an indication of the variety of motives that may account for

---

[5] The defendant does not challenge the admission of evidence showing constancy of accusation.

flight." *United States* v. *Telfaire,* 469 F.2d 552, 557 (D.C. Cir. 1972). Basic fairness and due process of law require that the trial court be evenhanded and instruct the jury that there could be other reasons for the defendant's flight. Furthermore, if an instruction on flight or concealment is to be given, the trial court should "explain to the jury, in appropriate language, that flight does not necessarily reflect feelings of guilt, and that feelings of guilt which are present in many innocent people, do not necessarily reflect actual guilt. This explanation may help the jury to understand and follow the instruction which should then be given, that they are not to presume guilt from flight; that they may, but need not, consider flight as one circumstance tending to show feelings of guilt; and that they may, but need not, consider feelings of guilt as evidence tending to show actual guilt." *Miller* v. *United States,* 320 F.2d 767, 773 (D.C. Cir. 1963). *Most importantly, the jury instruction should also make clear that flight or concealment is not sufficient in and of itself to establish guilt.* See *United States* v. *Mesa,* 660 F.2d 1070, 1077 n.2, reh. denied, 667 F.2d 93 (5th Cir. 1981).

The court relies on *State* v. *Wright,* 198 Conn. 273, 502 A.2d 911 (1986), to support its position that the trial court was not required to instruct the jury that there could be another reason for the defendant's flight. This reliance is clearly misplaced for two reasons. First, in *Wright,* this court merely stated that the trial court "was not required to enumerate *all* the possible innocent explanations offered by the defendant." (Emphasis added.) Id., 281. Although *Wright* does not give us the benefit of the trial court's instruction, an examination of the briefs in that case reveals that the court instructed the jury that it should consider any explanation offered by the defendant for his actions, and that evidence of flight is not conclusive and does not raise a presumption of guilt: "It is up to you to determine

if any evidence of explanation of the flight from the scene has been presented in this case. Also, it is up to you to determine the probative weight, if any, that you give to any explanation of flight, if you find any explanation was presented by the defendant in this matter. However, flight, if shown, is not conclusive nor does it raise a legal presumption of guilt, but it is to be given the weight to which the jury thinks it is entitled under the circumstances shown." *State* v. *Wright,* Conn. Supreme Court Records & Briefs, Nov. Term, 1985, Pt. 4, Defendant's Brief p. 11, State's Brief p. 14.[6] In the present case, the trial court neither instructed the jury that it could consider other reasons for flight, nor cautioned the jury that evidence of flight is not conclusive and does not raise a presumption of guilt.

Second, and more importantly, is that *Wright* relies on *United States* v. *Mesa,* supra, as its sole authority for holding that an evenhanded instruction is not required. *Mesa,* however, made clear that the instruction furnished by the trial court "was well balanced." Id., 1078. The trial court in *Mesa* instructed the jury, in part, that "[i]n your consideration of the evidence

---

[6] Justice David M. Borden and Professor Leonard Orland have recommended that the trial judge use a balanced instruction when there is another possible explanation for the defendant's flight: "Flight, when unexplained, tends to prove consciousness of guilt. The flight of a person accused of crime is a circumstance which, when considered together with all the facts of the case, may justify a finding of the defendant's guilt. *However, flight, if shown, is not conclusive.* It is to be given the weight to which you, the jury, think it is entitled under the circumstances. Here there was evidence that the defendant knew he was being sought for this charge and fled from the area on the day of his arrest. *There is also evidence tending to explain this flight, namely that the defendant was fleeing to escape arrest on other charges pending against him, and not this charge.* If you find that he was fleeing from this charge, you may consider it as evidence of his consciousness of guilt; *if you find that he was not fleeing from this charge, you should not consider it as evidence of his consciousness of guilt.* It is up to you to give the evidence the weight to which you think it is entitled." (Emphasis added.) 5 D. Borden & L. Orland, Connecticut Practice (1986) § 3.15.

of concealment, you should consider that there may be reasons for this which are fully consistent with innocence. These may include embarrassment at being arrested before family or friends. Also, a feeling of guilt does not necessarily reflect actual guilt."[7] Id., 1077–78 n.2.

## III

The state did not have an overwhelming case against the defendant. Indeed, the state recognized the need

[7] This instruction was preceded by the following: "The intentional concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not, of course, sufficient [in and of] itself to establish his guilt; but it is a fact which, if proved, may be considered along with all other evidence in determining guilt or innocence. Whether or not evidence of concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury." *United States* v. *Mesa*, 660 F.2d 1070, 1077 n.2, reh. denied, 667 F.2d 93 (5th Cir. 1981).

The desirability of an evenhanded instruction on flight is related to the defendant's claim that he should have been allowed to introduce evidence that, upon being arrested, the defendant waived his *Miranda* rights and admitted that he had struck the victim but denied having kidnapped or prostituted her. The defendant claimed that this evidence, together with the fact that he was on parole, suggested an alternative reason for his flight. The trial court excluded the proffered evidence. Surely, once the state opens the door by introducing flight or concealment evidence for the purposes of showing consciousness of guilt, basic fairness and logic require that the defendant be permitted to introduce evidence showing consciousness of *innocence*.

Professor Wigmore makes a convincing argument for such evidence as follows: "[I]t is judicially conceded . . . that the inference of consciousness of guilt is a highly dubious one, and that the evidence is never to be emphasized or treated as of much value. If this be so, why should we strain a doubt to admit a dubious inference against the accused, and yet refuse to admit in his favor a scarcely more dubious one? Such an attitude is wholly inconsistent with itself and is out of harmony with the spirit of our law. Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what it is worth, remembering that in either case it is open to varying explanations and is not to be emphasized. Let us not deprive an innocent person, falsely accused, of the inference which common sense draws from a consciousness of innocence and its natural manifestations." 2 J. Wigmore, Evidence (3d Ed. 1940) p. 190.

to bolster the credibility of the complainant, the only witness with firsthand knowledge of the alleged crime. Accordingly, I believe that admission of the hypothetical questions asked of the expert and the failure to instruct the jury that there could have been other reasons for the defendant's flight were incorrect, harmful and require a new trial.

Therefore, I respectfully dissent.