STATE OF CONNECTICUT *v.* TONY NIEMEYER
(AC 18590)

Lavery, Spear and Sullivan, Js.

Argued May 3—officially released October 26, 1999

*Pamela S. Nagy,* assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* senior assistant state's attorney, with whom, on the brief, were *Mary M. Galvin,* state's attorney, and *Paul Gaetano,* assistant state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant, Tony Niemeyer, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (3) and one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (C). He claims that the trial court improperly (1) admitted the testimony of the

state's expert witness on battered woman's syndrome without a proper foundation, (2) committed plain error by not giving a limiting instruction, sua sponte, as to the expert's testimony, (3) denied his motion for judgment of acquittal as to the kidnapping charge and (4) failed to instruct the jury on the specific intent required for kidnapping in the first degree. We affirm the conviction of assault in the first degree and reverse the conviction of kidnapping in the first degree.

The jury reasonably could have found the following facts. The defendant shared an apartment in Derby with his girlfriend, Dawn Siok, and her three children. On February 9, 1996, the defendant left the apartment to go to work on the 3:30 to 11 p.m. shift at Synthetic Products in Stratford. At approximately 11 p.m., Siok observed two individuals, known to her as Wayne and Joel, in her backyard. She invited them in and offered them a beer. The three then smoked a marijuana cigarette, and Joel left soon after. Shortly after midnight, the defendant returned and met Wayne, who was in the process of leaving.

The defendant believed that Wayne and Siok had been having an affair and demanded to know what Wayne was doing in the apartment. Siok started backing into the master bedroom. The defendant began hitting her in the stomach with a closed fist and calling her names. For the next two to three hours, the defendant repeated the cycle of assaulting Siok, leaving the room for a short time and then returning to assault her again. At approximately 3 a.m., the defendant stopped beating Siok and told her to take a shower. Siok showered and then went to sleep in her daughters' bedroom.

Siok remained in bed for most of that day. She told the defendant in the morning that she needed to see a doctor and asked him in the afternoon to bring her to a hospital. At approximately 10:30 p.m., the defendant

called an ambulance to take Siok to a hospital, but only on the condition that she promise not to have him arrested.

Winston Reed, an emergency room physician, examined Siok. He observed bruising on her left arm, and on the upper third of her chest and left ear. Siok's eyes were black and blue, and she complained of severe pain in the upper portion of her abdomen. Reed contacted Guy Nicastri, chief surgeon at the hospital, and asked him to examine Siok. Nicastri decided to operate and found that Siok was bleeding internally from a severed artery to her liver.

The defendant remained with Siok during most of her time at the hospital. A few days after being admitted, however, Siok was alone with her mother and sisters and told them that the defendant had assaulted her. On February 15, 1996, she told the police of the assault, and the defendant was subsequently arrested. Following a jury trial, the defendant was convicted of one count of assault in the first degree and one count of kidnapping in the first degree. This appeal followed.

I

The defendant first claims that the trial court improperly allowed the state to present expert testimony about battered woman's syndrome. He asserts that (1) because there was no evidence that Siok was a battered woman, the testimony was irrelevant, (2) the testimony bolstered Siok's credibility and, thus, invaded the province of the jury and (3) the prejudicial effect of the evidence outweighed its probative value. We disagree.

A

We first consider the defendant's claim that the admission of expert testimony on battered woman's syndrome was improper because there was no evidence

that Siok was a battered woman and, therefore, the testimony was irrelevant.

Certain additional facts are necessary to our resolution of this claim. During cross-examination, defense counsel questioned Siok about several inconsistencies between her testimony and her conduct. Siok had testified that she was "deathly afraid" of the defendant, but on cross-examination revealed that she had moved in with him despite this fear and also had contacted him despite the existence of a protective order. Following the cross-examination, the state disclosed that it would present the expert testimony of Evan Stark, a sociologist, on the subject of battered woman's syndrome.

The defendant filed a motion in limine to preclude Stark's testimony. After conducting a hearing outside of the presence of the jury, the trial court allowed the state to present Stark's testimony solely for the purpose of rehabilitation with respect to matters that were raised on cross-examination of Siok.

"Expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [E]vidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. . . . [T]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and in assessing the probative value of the direct testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Battista*, 31 Conn. App. 497, 513, 626 A.2d 769, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993). Our Supreme Court has held that

expert testimony concerning battered woman's syndrome is relevant "to describe the behavior patterns typically ascribed to battered women's syndrome." *State* v. *Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993). "Of course, expert testimony, like all other evidence, must be relevant to be admitted. *State* v. *Wade*, 96 Conn. 238, 248, 113 A. 458 (1921). Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior." *State* v. *Borrelli*, supra, 172 n.15. Therefore, the claims that the expert testimony should not have been admitted because there was no evidence that Siok was a battered woman and because the testimony was irrelevant are one and the same.

Here, the defendant claims that the state must present evidence that Siok had been battered at least twice before she can be classified as a battered woman. In support of this proposition, the defendant cites several cases from other jurisdictions and a book by Lenore Walker, a psychologist and researcher who has written extensively on battered woman's syndrome. The defendant fails, however, to cite any Connecticut case law establishing such a proposition as the law in this jurisdiction and we decline to adopt one now. While Walker writes that at least two cycles of abuse are required for the victim to be classified as a battered woman, Stark asserts that one cycle can be sufficient. In essence, the defendant is asking us to settle a dispute between two experts in the field of battered woman's syndrome. As stated in *Borrelli*, before testimony about battered woman's syndrome can be relevant, an evidentiary foundation must first be established that the victim is a battered woman. Id. The state clearly presented

evidence that Siok was battered at least once by the defendant. Whether sufficient abuse occurred to constitute battered woman's syndrome *in the victim* is not an evidentiary foundation question, but rather is a question of evidentiary weight.

It is important to note that the expert may testify only as to the general behavior of victims of domestic abuse. He may not give an opinion as to whether *this particular victim* told the truth or whether *this particular victim* in fact suffered from domestic abuse. See id., 173. These questions are solely within the province of the jury. See *State* v. *Ramos*, 53 Conn. App. 720, 724, 732 A.2d 197 (1999). Stark's testimony was offered to assist the jury in understanding whether Siok's conduct was consistent with the pattern and profile of a battered woman. See *State* v. *Borrelli*, supra, 227 Conn. 174.

B

Our Supreme Court's decision in *State* v. *Freeney*, 228 Conn. 582, 637 A.2d 1088 (1994), controls the defendant's claim that Stark's testimony bolstered Siok's credibility and therefore invaded the province of the jury when he responded to hypothetical questions posed by the state. In *Freeney*, our Supreme Court held that it was not impermissible for an expert witness to respond to hypothetical questions about the behavior of sexual assault victims for the purpose of establishing that the victim's behavior was generally consistent with that of such victims. Id., 592–93.

In *Freeney*, Barbara Moynahan, a psychotherapist, was allowed to answer hypothetical questions that tracked the testimony of the victim. She was "directed to assume that the details of the questions were established, and then she was asked if each individual reaction of the victim was 'consistent with a typical reaction to physical and sexual assault trauma.' Moynahan answered that each individual reaction of the victim

as set out in the hypothetical questions was indeed 'consistent' with a typical victim reaction." Id., 596–97 (*Berdon, J.*, dissenting). Justice Berdon, in a dissenting opinion, wrote that while Moynahan did not directly testify that the witness was credible, "the inevitable effect of her testimony was to vouch for the credibility of the victim's story, and therefore vouch for the credibility of the victim herself." Id., 597–98.

In the present case, Stark was asked four hypothetical questions that tracked the facts giving rise to the assault and kidnapping charges.[1] The defendant, in effect, asks

---

[1] The state's questions and Stark's responses in relevant part were as follows:

"[Assistant State's Attorney]: Assume that a woman is in a four year relationship with a physically stronger man. They have two children in common and they've lived together on and off. Assume that this woman had been punched, assaulted and verbally degraded by this man in the apartment for a period of time, meaning hours. . . . He orders her to take a shower. She takes a shower. She complies with his wishes. Is this compliance and submission behavior that is consistent with behavior of a battered woman in that situation?

"[Witness]: Yes, of course. . . .

"Q. Can you explain why, please?

"A. Well, which part of it in particular, counselor, do you want me to explain?

"Q. The submission and compliance.

"A. You don't have to be a battered woman. I mean, if somebody assaulted me severely and then told me to take a shower, I would take a shower. . . . I think the situation of danger is such and, as you described it, is so proximate, so right there, and presumably in the hypothetical you posed to me the person who hurt me was still in the room and presumably is bigger and could hurt me again. A person is going to be afraid, is going to do what they are told.

"Q. Assume further that this assault caused life-threatening injuries to the victim. And assume that this woman needed medical attention and that this man did not get her the medical attention she needed until some twenty-two hours after the assault began. Is it consistent with a battered women's syndrome to abide by this man's denial of medical assistance and not to seek it on her own?

"A. Well, certainly. If you remember the case of Hedda Nussbaum, it was almost two days that she had a ruptured spleen in the apartment before she was allowed to go to the doctor. By the time she got there, she was almost dead. So that's very typical.

us to adopt Justice Berdon's dissent by holding that these questions were improper. It is axiomatic, however, that we cannot rule in accordance with a dissent

"Q. Assume further that this man is arrested for the assault. As a condition of his bond, he is ordered to have no contact with this victim. Assume further, doctor, that this man gets out of jail and that the victim and the defendant . . . have contact with each other. The victim at times initiates contact with this man after this incident. Is that behavior consistent with the behavior of a battered woman's syndrome?

"A. Yes, it is. It exhibits the fact, in my opinion—now there may be other explanations for this—that she feels so intimidated and so frightened that she shifted her focus from escape to survival and then being with the guy again—it may not feel to us as helpless—but it feels to her that she's safer in his presence and knowing where he is. I've had women who, after they get protective orders and the guy's arrested, they move down the block from the guy and it drives everybody crazy who's trying to help them. And she explains—that she feels safer knowing where he is, keeping an eye on him. So moving in is even a better way, from her standpoint, of keeping an eye on him, being able to control his behavior. See, she believes only she can control his behavior. She doesn't believe anybody else, the police or the courts, can effectively do that for her.

"Q. Why is that, doctor?

"A. Because she's been so severely hurt she can't take a chance. Maybe they'll arrest him, maybe they'll take him away, but in the time between that he might almost kill her again.

"Q. Even assume further that she even claims she's deathly afraid of him.

"A. Again, I think it's because she's deathly afraid that she does this. It's because she feels so much anxiety about him, what he's going to do, that she does this. I know it's very hard for people who haven't had these experiences to understand. . . . You see this with kids in school systems all the time. . . . They get into fights against people they know are going to hurt them a lot just because they want to get it over with.

"Q. Assume further in this situation that this victim is hesitant to call for help, even when she's apparently free to do so. Is that consistent with—

"A. Well, that's the learned helplessness I was talking about earlier, counsel.

"Q. Can you explain that again? Why the victim in the hypothetical that I have given you would be so hesitant to call for help when she's apparently free to do so?

"A. Well, assuming the batterer is not present at the time, in her mind his power is much greater than it would seem to be to us. We would think she would seize the first opportunity to call the police or call the hospital when in fact, when he leaves, she doesn't feel any safer than when he's present. So she's afraid of what the consequences would be if she does call the hospital or call the police. Even if she does call them, what's going to happen then? Are they going to identify him? Are they going to arrest him?

that is contrary to a controlling majority opinion of our Supreme Court. See, e.g., *State* v. *Sivri*, 46 Conn. App. 578, 586, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997) (declining to adopt dissenting view of Supreme Court holding). As in *Freeney*, "[t]he distinction between testimony about the general behavior of victims and an opinion as to whether the instant victim is telling the truth is critical." *State* v. *Freeney*, supra, 228 Conn. 592. Stark did not give an opinion as to whether Siok had told the truth or whether she in fact suffered from battered woman's syndrome. See id., 592–93. Stark's expert testimony could have assisted the jury substantially in understanding whether Siok's conduct was consistent with the pattern and profile of a battered woman. The testimony did not invade the province of the jury in determining the credibility of Siok.

C

The defendant's last claim on this issue is that Stark's testimony was more prejudicial than it was probative. We disagree.

---

Is she going to be safe or is he just going to get more upset and hurt her worse? So the fact that he's present or not present is not going to change her behavior.

"The other thing, which is consistent with learned helplessness, is that she simply doesn't believe anybody can help her effectively. They either won't believe her or they'll find something else about her that will discredit her story, or he'll charm them into believing that he's right and nothing serious has happened. And then when she leaves, wherever it is she leaves the hospital or police station, something worse will happen to her.

"Q. Even though she may be in the company of a police officer, would that change?

"A. Well, what's interesting about battered women is that when they're in the company of help providers or counselors, they actually become more anxious because what they're afraid of more than anything else, what [the abuser has] threatened her with more than anything else, is what will happen if there's disclosure. So when [victims] think the police might find out, that's when their anxiety really gets extraordinary. They'll say anything. I've had women confess [to police] to crimes that they've never committed simply because they didn't want the batterer to hurt them."

"The primary responsibility for conducting the preju-dicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omit-ted.) *State* v. *Wargo*, 53 Conn. App. 747, 761, 731 A.2d 768, cert. granted on other grounds, 250 Conn. 922, 738 A.2d 662 (1999). As we have already concluded, Stark's testimony could have assisted the jury substantially in understanding whether Siok's conduct was consistent with the pattern and profile of a battered woman. The court reasonably could have concluded that the proba-tive value of this evidence outweighed its prejudicial effect and, therefore, we are not persuaded that the court abused its discretion.

## II

At trial, the defendant did not request a limiting instruction regarding the use of Stark's testimony, but now claims that the failure of the trial court to instruct the jury, sua sponte, regarding the permissible use of the testimony constitutes plain error. There is no merit to this claim.

Practice Book § 60-5 (formerly § 4061) provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subse-quent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." "[Our Supreme Court] consistently [has] stated that review under the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the

judicial proceedings." (Internal quotation marks omitted.) *State* v. *Stephens*, 249 Conn. 288, 291, 734 A.2d 533 (1999). While the defendant cites to several cases in which a limiting instruction has been given, he fails to provide any authority for the proposition that the court, sua sponte, must give a limiting instruction. We decline to consider this claim because it fails to meet the stringent standard required for plain error review.

### III

The defendant next claims that the trial court improperly denied his motion for judgment of acquittal at the close of the state's case. The defendant did not present any evidence and renewed this motion prior to sentencing. He claims that the evidence was insufficient to support the conviction of kidnapping in the first degree. We agree and reverse the judgment of conviction.

"We employ a two part analysis in reviewing the sufficiency of the evidence to sustain a criminal conviction. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Faria*, 47 Conn. App. 159, 186–87, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998).

General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . or (C) terrorize him or a third person . . . ." General Statutes § 53a-91 provides in relevant part: "(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . . (2) 'Abduct' means to restrain a person with intent to prevent his liberation by . . . (B) using or threatening to use physical force or intimidation. . . ."

As the defendant points out, there simply was no evidence from which the jury reasonably could infer that he restrained or abducted Siok. Viewing the evidence in the light most favorable to the state, the jury reasonably could have found the following. The defendant and Siok shared an apartment. When the defendant arrived home and became angry at finding Wayne in his apartment, Siok started backing into the master bedroom. The defendant demanded to know what Wayne was doing in the apartment and hit her in the stomach with a closed fist while calling her various names. For the next two to three hours, the defendant repeated the cycle of assault, leaving the room for a short time and then returning to assault her again. At approximately 3 a.m., the defendant stopped beating Siok and told her to take a shower. Siok showered and then went to sleep in her daughters' bedroom. Siok remained in bed for most of that day. She told the defendant in the morning that she needed to see a physician and asked him in the afternoon to take her to a hospital. At approximately 10:30 p.m., the defendant

called an ambulance to take Siok to a hospital, but only on the condition that she promise not to have him arrested.

There was no evidence that the defendant restricted Siok's movement in any manner. The defendant did not force Siok into the master bedroom, tell her to remain there, prevent her from leaving the room or threaten her with violence if she left. Siok did not testify that she tried to escape and was prevented from doing so. She did not testify that she was afraid of the defendant and for this reason did not try to escape. Cf. *State* v. *Drake*, 19 Conn. App. 396, 400–401, 562 A.2d 1130 (1989).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the state presented insufficient evidence that the defendant restrained or abducted Siok. Therefore, the trial court improperly denied the defendant's motion for judgment of acquittal. Because we are reversing the kidnapping conviction, we need not reach the defendant's last claim.

The judgment is affirmed as to the conviction of assault in the first degree; the judgment is reversed as to the conviction of kidnapping in the first degree and the case is remanded with direction to render a judgment of acquittal as to that count.

In this opinion the other judges concurred.