STATE OF CONNECTICUT *v.* JOSEPH IZZO
(AC 23646)

Dranginis, McLachlan and Stoughton, Js.

---

[5] The plaintiff adduced the check register at trial, and it was admitted into evidence as a full exhibit.

Argued January 9—officially released March 30, 2004

*David V. DeRosa*, special public defender, for the appellant (defendant).

*Proloy K. Das*, special deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Anthony Bochicchio*, assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. The defendant, Joseph Izzo, appeals from the judgment of conviction, rendered after a jury trial, of two counts of burglary in the first degree in

violation of General Statutes §§ 53a-101 (a) (1) and (2), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (1), and attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2). His sentence was enhanced for having committed a class B felony with a firearm in violation of General Statutes § 53-202k. On appeal, the defendant claims that (1) he was deprived of his right to due process and a fair trial by the introduction of evidence of prior misconduct, (2) the prosecutor engaged in egregious misconduct and, thus, deprived him of a fair trial and (3) the evidence was insufficient to prove entry into the victims' residence, a required element of the burglary charge. We do not agree with those claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Sometime in June, 2001, the defendant told Michael Martinez about a plan to lie in wait for Thomas Farrington and his wife, Susan Farrington, outside of their house in New Fairfield. The defendant plotted to push the Farringtons into their house, tie them up and rob them. The defendant showed Martinez the Farringtons' house, as well as a shotgun and some wire ties. The defendant informed Martinez that there was $100,000 located in the Farringtons' safe and that Martinez' part in the robbery would be to grab Susan Farrington. Martinez declined to participate in the defendant's plan.

On June 4, 2001, Martinez, after being arrested on an unrelated matter, told the police that he had information about a pending home invasion and robbery. He described the plan and said that it was suggested to him by "Joe," an individual he described as "an Italian" who was staying at a Best Western motel. The police found the name of the defendant registered at the motel and showed Martinez a photographic array containing three photographs from which Martinez identified the

defendant. The police drove Martinez around New Fairfield, and he identified the Farringtons' home as the target of the defendant's plan. The state police were notified, and they watched the house for a time until they believed the danger had passed.

The police informed Thomas Farrington of the possible plot against him and his wife. The Farringtons subsequently devised a plan for self-protection. Thomas Farrington, a gun collector, deposited loaded guns in various places in his house. He and his wife arranged that whenever they arrived home, she would remain in their vehicle until he had determined that it was safe for her to enter the house. The plan was for him to enter the house, turn off the alarm and turn on the outside lights as a signal that it was safe to enter.

On June 28, 2001, the Farringtons returned home after having gone out to dinner. They arrived just after 10 p.m. and utilized their security precautions. Thomas Farrington entered the home, turned off the alarm, turned the lights on and told his wife to come in. As Susan Farrington got out of the car, three men rushed at her from their concealed hiding spot near the house. Two of the men ran toward her and threw her to the ground. All of the men wore masks of some kind and were armed. One of the men had a handgun, which he put to her head. Susan Farrington screamed for her husband and watched as a man with a mask and a rifle ran to the house. When Thomas Farrington heard his wife's screams, he retrieved a loaded handgun from under a cushion on a nearby couch. He then saw the front door of his house open and a masked man enter carrying a rifle. As the intruder looked to his right and saw him, Thomas Farrington attempted to shoot his handgun, but the weapon would not fire because the safety was on. The intruder ran from the Farringtons' house.

Thomas Farrington followed the masked intruder from the house and saw one of the other men still on top of his wife, who was lying prone on the ground. Thomas Farrington fired his handgun at the man who had run from the house. Thomas Farrington fired gunshots until the weapon's magazine was empty but did not hit anyone. The two men who had attacked Susan Farrington fled, and Susan Farrington managed to retreat to the safety of the house. Thomas Farrington, after obtaining a second gun from the house, told his wife to telephone the police.

Thomas Farrington then observed one of the men running up a hill and took the cordless telephone from his wife to report what had happened. He ran to the street and saw the man getting into a sport utility vehicle that was located up the hill. He fired six gunshots, hitting the vehicle with some of them.[1] The vehicle sped away and eventually went off the road, down an embankment and crashed into a tree. The three men were able to escape through a wooded area. Neither of the Farringtons could identify any of the three masked men.

The police arrived at approximately 10:30 p.m., set up roadblocks and used dogs to try to track the suspects. They found a green vehicle in a gully near the Farringtons' house. There were bullet holes in the vehicle, and bullet fragments were found that were determined to have been fired from Thomas Farrington's gun. In the vehicle, the police found the defendant's cellular telephone and pager. On the ground next to the vehicle, the police recovered a gas mask, and subsequent testing revealed the presence of the defendant's DNA in the mask. The police also found two duffle bags

---

[1] We note that it was due only to an extremely fortuitous set of circumstances that no one, particularly an innocent bystander to the crime, was injured during the shooting spree.

on the Farringtons' property that contained, among other items, a baseball bat, duct tape, electrical ties, a two-way radio, ammunition and latex gloves.

The green vehicle that the masked men had used to flee the scene was registered to the father of Theresa Hinty, the defendant's girlfriend. Earlier that evening, Hinty had driven the vehicle to a restaurant where she worked and left it parked there. The defendant had called Hinty on his cellular telephone at about 9 p.m. and arranged for her to leave the ignition key under the mat of the vehicle so that he could borrow it that night. At about 11 p.m., she discovered that the vehicle was not in the lot.

At some point in time, the defendant told Martinez that the plan had backfired. He explained to Martinez that the victim had two guns and had shot at him, that he ran and escaped through the wooded area and that he saw state police dogs in the wooded area.

Before we discuss the defendant's claims, we note that it often is possible, after the verdict, to conclude that certain pieces of evidence might not have been absolutely necessary. We recognize, however, that when a defendant in a criminal trial pleads not guilty, the state is required to meet the burden of proving, beyond a reasonable doubt, that the defendant committed the crimes charged. The parties do not know beforehand how the witnesses will withstand cross-examination, how the jury will assess their credibility or how it will interpret the evidence.

We also reiterate the common-law principle, recognized in our case law and code of evidence, that any evidence that is relevant is admissible unless some other rule makes it inadmissible. See *Jenkins* v. *Kos*, 78 Conn. App. 840, 843, 829 A.2d 31 (2003); Conn. Code Evid. § 4-2. A party is entitled to offer any relevant evidence to aid the trier of fact in its determination, as

long as the evidence is not unfairly prejudicial. *Jenkins* v. *Kos*, supra, 845.

I

The defendant first claims that five instances of irrelevant prior misconduct "found their way in front of the defendant's jury."[2] Of those five instances, only one was properly preserved for review.

At the outset, we set forth certain legal principles and the standard of review that guides the resolution of the defendant's claim. "Connecticut Code of Evidence § 4-1 provides in relevant part that [r]elevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. As it is used in the code, relevance represents two distinct concepts: Probative value and materiality. Conn. Code Evid. § 4-1, commentary. Conceptually, relevance addresses whether the evidence makes the existence of a fact material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . [I]t is not necessary that the evidence, by itself, conclusively establish the fact for which it is offered or render the fact more probable than not. Conn. Code Evid. § 4-1, commentary. In contrast, materiality turns upon what is at *issue* in the case, which generally will be determined by the pleadings and the applicable substantive law . . . . Id. If evidence is relevant and

---

[2] The defendant claims that the admission of that evidence deprived him of his constitutional rights to due process and to a fair trial. We are not persuaded. "[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Citation omitted; internal quotation marks omitted.) *State* v. *Wargo*, 53 Conn. App. 747, 753, 731 A.2d 768 (1999), aff'd, 255 Conn. 113, 763 A.2d 1 (2000).

material, then it may be admissible. See id., § 4-2." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gombert*, 80 Conn. App. 477, 488–89, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004).

"We begin our review of the trial court's action by noting that [a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. . . . Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. . . .

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Camera*, 81 Conn. App. 175, 183, 839 A.2d 613 (2004). With the foregoing principles in mind, we now turn to the defendant's specific claims.

A

The defendant first argues that the court improperly admitted into evidence the fact that he was prohibited from entering the restaurant where Hinty worked. On the night of June 28, 2001, when the defendant telephoned Hinty at the restaurant to arrange to borrow her vehicle, it was agreed that she would leave the ignition key under the floor mat of the vehicle. The reason she left the key under the mat was because the defendant was prohibited from entering the restaurant.

The defendant filed a motion in limine to preclude testimony concerning the reason that the key was left under the mat. The court deferred a decision on the defendant's motion until the question came up during the trial. The court subsequently granted the motion in part and ordered that there be no mention of why the defendant was not permitted into the restaurant.

During the trial, Hinty testified that the defendant had telephoned her, stating that he would be at the restaurant in fifteen minutes to get the vehicle. She testified that she did not give the defendant the keys and that she put them under the mat in the vehicle. When asked why she had done that, the defendant objected, arguing that there was no need for the jury to know the reason. The prosecutor responded that the witness had been instructed to state only that the defendant was not allowed into the restaurant and not to give the reason why the defendant was not permitted there. The prosecutor asserted that because Hinty did not see the defendant take the car, the time frame was important and that because there were innocent reasons for not allowing the defendant to enter the restaurant, the evidence was not prejudicial. The defendant objected, arguing that evidence that he was not allowed to enter the restaurant had nothing to do with the time frame. The court overruled the objection on the ground

that the evidence was relevant and, thereafter, Hinty testified that she put the keys under the mat because the defendant was not allowed in the restaurant.

We agree with the court that the evidence was relevant. Although the evidence did not establish a precise time frame, it did explain why Hinty left the keys to her unlocked vehicle under the floor mat in a parking lot outside the restaurant. That information was helpful to demonstrate to the jury the events of the night in question and to fill in some of the background details. It was necessary for the prosecution to establish that the defendant had the vehicle that night, and Hinty's testimony was part of the chain of evidence that was relevant to proving that fact. Hinty could testify that the defendant had arranged to borrow the vehicle, but could not state that she had seen him take it. It would be natural for the jury to wonder why Hinty had not simply given the keys to the defendant and why she had left them in the vehicle. The evidence was relevant as part of the circumstances under which the defendant obtained the use of the vehicle. Despite the defendant's claim, that was not evidence of prior misconduct because nothing was said of the reason for not allowing the defendant to enter the restaurant. It is difficult to see how the statement that he was not allowed in the restaurant could have caused harmful prejudice to the defendant. Any prejudice there might have been was outweighed by the probative value of the evidence. In any event, any prejudice would have been harmless in light of the other evidence admitted to prove the defendant's guilt. In short, we cannot say that the court abused its discretion in allowing the challenged testimony into evidence.

## B

The defendant did not preserve any of his remaining claims of error and has requested plain error review.

See Practice Book § 60-5. He asserts that either viewed individually or taken together, those evidentiary rulings were harmful to him. We must, therefore, determine if such review is warranted.

"As we often have stated, [p]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . Furthermore, even if the error is so apparent and review is afforded, the defendant cannot prevail on the basis of an error that lacks constitutional dimension unless he demonstrates that it likely affected the result of the trial." (Internal quotation marks omitted.) *Menon* v. *Dux*, 81 Conn. App. 167, 172, 838 A.2d 1038 (2004).

1

The defendant first argues that he was prejudiced by the admission of a statement elicited from a witness regarding his police mug shot. During the trial, Craig Martin, one of the police detectives who had interviewed Martinez, testified that as he investigated the information about the planned robbery, the police came to suspect the defendant. Martin was asked if he had shown Martinez any photographs and responded that he had shown Martinez "three mug shots of white males with [the defendant] being one of them." The prosecution had not asked about "mug shots," and there was no objection when Martin used the words. The photograph was not introduced into evidence. The words were unsolicited and uttered spontaneously by the witness. The defendant's claim simply does not meet the high threshold necessary for plain error review.

2

The defendant next argues that he was prejudiced by the admission of evidence, of his prior use or sale of cocaine. The state called Daniel Trompetta, one of the investigating detectives. During cross-examination, Trompetta was asked how he had developed the defendant as a suspect. He responded: "Mr. Martinez described him and stated his name was Joey, he was an Italian, he told me he was from Brooklyn and Martinez was from Brooklyn, so they kind of hit it off. Martinez said they used to exchange some cocaine together." Defense counsel immediately objected, and the objection was sustained by the court.

The defendant claims that the court, sua sponte, should have ordered the testimony stricken. Although the defendant's objection was sustained, the defendant failed to seek to have the unsolicited remark stricken. The defendant has not provided this court with any authority for the proposition that the trial court was under an obligation to strike the testimony in the absence of a motion to strike. See generally *State* v. *Koslik*, 80 Conn. App. 746, 765–66, 837 A.2d 813 (2004). Furthermore, the jury was instructed that certain matters were not evidence and, therefore, were not to be considered, including testimony that had been excluded or stricken. In short, the defendant's claim fails to meet the stringent requirements of plain error review.

3

The defendant next argues that he was prejudiced by the improper testimony of Thomas Farrington. During cross-examination, defense counsel established that Thomas Farrington had known the defendant because they once had lived on the same street. The following colloquy then occurred:

"[Defense Counsel]: And you grew up on the same street as [the defendant], is that correct?

"[The Witness]: Yeah. I know [the defendant], you know, more so from reading the police blotter and everything else—

"The Court: All right. Now, stop right now. You have to do this very carefully, you answer the questions."

The court then proceeded to strike Thomas Farrington's commentary. The remark was unsolicited by the prosecutor, and the court immediately stopped the testimony and admonished the witness.[3] The court ordered the jury to disregard the extraneous response. The defendant did not ask the court to take any additional action, such as to declare a mistrial. The defendant's claim, therefore, does not warrant plain error review.

4

The defendant next argues that the state improperly offered evidence that he was an adulterer. Hinty testified that she was romantically involved with the defendant at the time of the crimes and that he, on occasion, had stayed with her at various hotels during the past six months of their relationship. Later testimony revealed that the defendant was married at the time. The defendant claims that he was prejudiced unfairly by the testimony about his affair with Hinty. There was no objection to the testimony, and we are not persuaded that plain error review is warranted for that unpreserved claim of evidentiary error.

5

The defendant's final claim is that, taken together, those four unpreserved instances of alleged prior misconduct evidence, combined with the testimony that he was not allowed to enter the restaurant, were so harmful that a failure to reverse the judgment would

---

[3] The court instructed Thomas Farrington to answer only the question asked and to avoid providing any additional commentary.

result in manifest injustice. He asserts that the trial judge should have given, sua sponte, a limiting instruction as to the use of evidence of uncharged misconduct and that it was plain error not to do so. No such charge was requested, and the court was not obligated to do so sua sponte.

"The defendant cites no authority for the proposition that the court, sua sponte, must give a limiting instruction under the circumstances of this case. *It is well established in Connecticut, however, that the trial court generally is not obligated, sua sponte, to give a limiting instruction.*" (Emphasis added.) *State* v. *Cator*, 256 Conn. 785, 801, 781 A.2d 285 (2001); see also *State* v. *Niemeyer*, 55 Conn. App. 447, 458, 740 A.2d 416 (1999), rev'd in part on other grounds, 258 Conn. 510, 782 A.2d 658 (2001). The defendant has not·persuaded us that any of those claims, singly or taken together, establish his claim of plain error.

II

The defendant next claims that the prosecutor engaged in a pattern of egregious misconduct throughout the trial. Only two of the instances of claimed prosecutorial misconduct were preserved, and the defendant requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), for the remaining claims.

"Prior to analyzing the defendant's specific claims of prosecutorial misconduct, we set forth the well established principles that guide our inquiry as to all of his claims. To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . Moreover, in analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial, an inquiry that in the present case necessarily will require evaluation of the defendant's other misconduct claims." (Citations omitted; internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 806–808, 835 A.2d 977 (2003).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. . . . Thus, the question . . . is whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether

the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003). With the foregoing in mind, we now turn to the specific claims of error.

A

We first address the preserved claims of error. Specifically, the defendant claims that the prosecutor improperly shifted the burden of proof during the questioning of two of the witnesses and during closing argument to the jury.

The following additional facts are necessary for the resolution of that issue. The state called Mark Maisano, one of the investigating detectives, to testify. On cross-examination by the defendant, Maisano explained that he had taken photographs of the defendant on June 29, 2001, because he saw fresh scratch marks on him that appeared to be consistent with someone running through a wooded area. On redirect examination, the prosecutor asked if the defendant had explained how he got the scratches, and Maisano stated that the defendant had said that they were from work. The prosecutor asked Maisano if the defendant had provided him with the names of anyone who could verify that. Counsel for the defendant objected, and the court sustained the objection.

The state also called Christine Roy, a criminalist employed by the department of public safety in its forensic science laboratory. Roy testified that she had examined certain physical evidence for physiological fluids and performed DNA testing. She stated that the police had submitted items for testing and that defense attorneys are permitted to submit items for testing. Roy

described the testing she performed and the results she obtained. She was then asked how many requests for testing she had received from the defense and replied that she had received none. The defense earlier had established that a number of the seized items that had been sent to the laboratory had not been tested because the laboratory deemed that it was not essential to examine them and that some of the seized items were not sent to the laboratory at all. During closing argument, the prosecutor commented that defense counsel had addressed a number of items that had not been tested, but the jury "never heard what the defense requested." The court overruled an objection that the prosecutor was shifting the burden of proof. The prosecutor continued, commenting on the defendant's failure to request scientific testing on any of the evidence and another objection followed. The court instructed the prosecutor to "move along" and "stay out of this area."

The defendant argues that the combination of the questions during the evidentiary phase of the trial and the comments made during closing argument constituted prosecutorial misconduct and, thus, deprived him of a fair trial. We are not persuaded.

The court sustained the defendant's objection to the question posed to Maisano with respect to whether the defendant had provided the names of any individuals who could verify that he received the facial wounds at work. Even if we were to determine that that isolated question was improper, it did not deprive the defendant of a fair trial. Furthermore, the court sustained the defendant's objection, and the jury, in the absence of any proof to the contrary, is presumed to have followed the court's instructions to ignore testimony that was not admitted properly. See State v. Vargas, 80 Conn. App. 454, 468, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004).

Similarly, the defendant's claim as to his failure to have scientific testing performed on the evidence is unavailing. Even if it was somewhat questionable, the argument was based on the evidence and was invited by defense counsel's cross-examination, showing that a number of seized items had not been examined and hence suggesting that examination might have revealed some kind of evidence. Furthermore, the court properly instructed the jury on the burden of proof, the presumption of innocence and that the defendant did not have to prove his innocence. The defendant has not identified anything in the record to show that the jury disregarded those instructions. See *State* v. *Jefferson*, 67 Conn. App. 249, 269–70, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

B

We now review the defendant's unpreserved claims of prosecutorial misconduct. The defendant seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40,[4] of three matters that occurred during the prosecutor's argument to the jury. We note that "[w]e have long held, however, that *Golding* review of such a claim will not result in reversal where the claimed misconduct was not blatantly egregious and merely consisted of isolated

---

[4] "In *Golding*, our Supreme Court held that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Emphasis in original; internal quotation marks omitted.) *State* v. *Garcia*, 81 Conn. App. 294, 298, 838 A.2d 1064 (2004).

and brief episodes that did not reveal a pattern of conduct repeated throughout the trial . . . because in such a case the claimed misconduct is insufficient to infect the fundamental fairness of the trial itself. . . . Again, it is important to note that the defendant made no objections and failed to ask for any curative instruction with regard to [these] prosecutorial misconduct claims. The defendant, therefore, presumably did not regard those remarks . . . as seriously prejudicial at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 81 Conn. App. 1, 6–7, 838 A.2d 214 (2004). We conclude that each of the claims fails under the third prong of *Golding*, which requires an alleged constitutional violation that clearly exists and clearly deprived the defendant of a fair trial.

1

In discussing Martinez' testimony, the prosecutor invited the jury to consider whether he was credible and asked whether he looked frightened or afraid. The prosecutor asked whether the members of the jury might be concerned for their safety if they testified against somebody accused of the kinds of crimes at issue. That was a reasonable and proper comment on the witness' demeanor. See *State* v. *Cobb*, 27 Conn. App. 601, 609, 605 A.2d 1385 (1992). Indeed, defense counsel also commented on Martinez' nervous demeanor. Thus, the defendant's claim fails to meet the third *Golding* prong.

2

The defendant next argues that the prosecutor improperly bolstered and vouched for the credibility of a witness. The state called Susan Farrington as a witness. During her testimony, she explained that she had worked for a United States Navy supplier, and that she had to have a government confidential clearance and background check by the Federal Bureau of Investiga-

tion. There was no objection to that testimony. In discussing the credibility of witnesses during closing argument, the prosecutor mentioned that Susan Farrington had a government job and had passed the background check, and that the jury could consider that in evaluating her testimony.

The prosecutor did not bolster or vouch for Susan Farrington's credibility. Instead, the prosecutor merely commented on her response to a proper background question and reminded the jury of Susan Farrington's answer. Additionally, we note that the court gave the jury a proper charge on credibility. Accordingly, the defendant's claim fails to satisfy *Golding*'s third prong.

3

Finally, the defendant claims that the prosecutor improperly commented on the fact that the defendant did not testify. "It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965)." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 269, 833 A.2d 363 (2003).

During closing argument, the prosecutor made the following statements: "What were they driving? The defendant's girlfriend's [vehicle]. The [vehicle] by his own testimony—by his own words to the police, he picked up at 8:55 p.m. a little over an hour before this burglary. His own testimony he used [it] for forty-five minutes. . . ."

The defendant did not object. He now claims that the use of the word "testimony" was a comment on his failure to testify. We disagree and note that the prosecutor, after using the phrase "by his own testi-

mony," immediately corrected himself and said "by [the defendant's] own words to the police . . . ." Additionally, the court, during its charge, instructed the jury that it was not to draw an unfavorable inference from the fact that the defendant did not testify.[5] The claim lacks merit and deserves no further comment.

### III

The defendant's final claim is that the evidence was insufficient to prove that any of the three men ever entered the house. "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Santos,* 81 Conn. App. 147, 149–50, 838 A.2d 1020 (2004).

"Our Penal Code provides: A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and (1) . . . is armed with . . . a deadly weapon or dangerous instrument . . . . General Statutes § 53a-101 (a)." (Internal quotation marks omitted.) *State* v. *Stagnitta,* 74 Conn. App. 607, 611–12, 813 A.2d 1033, cert. denied, 263 Conn. 902, 819 A.2d 838 (2003).

The argument made by the defendant simply ignores the plethora of evidence from which the jury reasonably might have concluded that the Farringtons' attacker had entered their house. For example, Thomas Farring-

[5] Specifically, the court instructed the jury: "The defendant's failure to testify. The accused . . . has not testified in this case. An accused person is under no obligation to testify [on] his own behalf. He has a constitutional right not to testify. You may not draw any unfavorable inferences."

ton, in describing the incident, testified that the front door had opened and that the person looked ahead and then looked to the right. The jury might reasonably have inferred that the person must have been inside the house. During cross-examination, Thomas Farrington testified that when the door opened, he went to the couch, laid down and pointed the gun at the head of the man who had come into the house. Defense counsel asked what hand the intruder had the gun in, and Thomas Farrington testified that it was the right hand. Susan Farrington testified that when she was pushed to the ground, she saw a "gentleman" running from her and "proceeding to go into my house." Later, she testified: "I saw this gentleman run into my house, running out of my house, and I ran in." Finally, we note that Martinez testified that the defendant had told him that he had been shot at by Thomas Farrington.

The sum of the evidence indicates that a reasonable jury could have concluded that one of the three intruders, at some point during the violent episode, broke the plane of the door and entered into the Farringtons' house. Accordingly, we conclude that the defendant's claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.