******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v*. DARRYL CRENSHAW
(SC 18745)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued March 18—officially released August 12, 2014*

*William B. Westcott*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Dennis J. O'Connor*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Darryl Crenshaw, appeals from the judgments of conviction, rendered after a jury trial, of two counts of kidnapping in the second degree in violation of General Statutes § 53a-94 (a), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that (1) the trial court abused its discretion in joining the defendant's two cases for trial, and (2) the evidence was insufficient to support his conviction of both counts of kidnapping in the second degree. We uphold the trial court's decision to join the cases, affirm the judgments of the trial court with respect to the first count of kidnapping in the second degree, assault in the third degree and murder, and reverse the judgment of conviction with respect to the second count of kidnapping in the second degree.

The jury reasonably could have found the following facts. The victim, Ashley Peoples, lived with her mother and stepfather in the town of Enfield. A friend and coworker, Elisa Astacio, described the victim as "the brightest star. Everyone love[d] her, everyone loved her personality; everybody was friends with her." In June or July, 2008, the victim began dating the defendant. Although they appeared happy at first, the defendant became more controlling as their relationship progressed. The defendant was "stubborn" and "like[d] to get his way . . . ." He and the victim would verbally and physically fight. The victim informed Astacio in late July or early August that she wanted to end the relationship.

On August 7, 2008, at approximately 5:15 p.m., the victim arrived at the house of Shavonne Coachman, a friend, and Coachman's infant son, and, thereafter, they drove together to Supreme Clientele, a beauty salon (salon) in the city of Hartford. They arrived at the salon at around 5:30 p.m. and went inside. Coachman left various items for her son in the victim's car. While the victim and Coachman were talking and waiting for an appointment at the salon, the defendant called the victim on her cell phone. Shortly thereafter, the defendant arrived in his vehicle, entered the salon, and spoke with the victim for approximately five or six minutes. The defendant then exited the salon, got in his car and left.

Coachman and the victim resumed their conversation, only to be interrupted again by a call from the defendant. Coachman overheard the victim attempting to identify a male voice that the defendant allegedly had heard at the salon. This conversation lasted for about three minutes. After the call ended, the victim informed Coachman that the defendant was "coming back . . . ." She then gave her cell phone to Coachman, explaining that the defendant "like[d] to break phones"

when they argued.

Shortly thereafter, the defendant arrived at the salon, and the victim went outside. A patron of the salon, Timothy Freeman, who was sitting in his car in the parking lot, saw the defendant and the victim flail their arms as they argued. The victim attempted to get into the driver's side of the defendant's vehicle, but the defendant got in first, forcing the victim to walk around to the passenger side. After the victim entered the vehicle, the defendant punched her in the face and proceeded to drive away.[1] Freeman described the incident as a "sucker [punch] . . . ." As the defendant drove away, he punched the victim in the face a second time. By the time Coachman ran to the front door of the salon, the defendant and victim were gone.

Coachman immediately began calling the defendant from the victim's cell phone. After approximately one-half hour of continuous attempts to reach the defendant, he answered. Coachman asked the defendant to bring the victim back to the salon. The defendant responded that he would "bring her back when she feels like coming back." Coachman continued to plead for the victim's return, informing him that she had left supplies for her son in the victim's car. The defendant reiterated that he would bring the victim back when she "feels like coming back." After the defendant ended the conversation, Coachman waited for two hours at the salon for the victim to return. The victim never came back.

At around 6 or 7 p.m. that evening, the defendant went to the apartment of Eruverto Flores, Astacio's boyfriend, at 777 Maple Avenue in Hartford. When the defendant entered Flores' apartment, Flores realized that the victim was trailing behind the defendant. The victim "had a blood clot in her eye," the inside of her left eye was "red" and "bloodshot," and the area under her eye was swollen. Flores testified that it was "obvious" that the defendant had hit the victim.

The defendant was yelling and appeared upset. He exclaimed that the victim had "disrespected" him because she was flirting with another man at the salon. He claimed that the victim "disrespected [him] on [his] side of town in front of all [his] peoples, [and he was] not [going to] let no girl disrespect [him] and make [him] look bad in front of everybody." At some point, the defendant "mushed [the victim] in the head," meaning that he used an open hand to push her head away from him. Flores then jumped in between the defendant and the victim and told him to "chill out" and not engage in such actions in his apartment.

The victim then went into the bathroom. After Flores spoke to the defendant in an attempt to calm him down, Flores went to check on the victim. The victim was wiping tears from her eyes. Flores offered to take the

victim to her car, to call her parents, or to help in any other way he could. The victim declined. When the victim left the bathroom, she sat about twenty feet away from the defendant. Flores testified that the victim "was pretty much sitting there with her head down . . . not really interacting with anybody, just sitting there." She did not participate in the conversation. About fifteen or twenty minutes later, the defendant and the victim left together.

At some point during the evening of August 7, the defendant called Teosha Sease, a woman whom he had met the week before, about going on a first date the next day to Six Flags New England amusement park (Six Flags) in Agawam, Massachusetts. Sease observed that the defendant seemed "upset" during this conversation.

Between 2 and 3 a.m. on August 8, 2008, the defendant's next door neighbor, Guy Maynard, saw the defendant pull up in his vehicle to the front of the defendant's residence at 65 Church Street in Enfield. Maynard testified that, "after the car stopped and the lights went off, the [defendant] got out and . . . walked around the front of the car to the [passenger] side, where he opened the door and picked up somebody out of the front seat of the car." The defendant "cradled" the individual "like you would hold a child," with both arms underneath, and "[c]arried [her] towards the front of the house." Maynard could tell that the person being carried was "slight" and African-American, and he believed the person was probably a female. He thought at the time that the defendant was carrying this person because she was inebriated. The defendant carried the person into his apartment. After some time had passed, Maynard saw the flickering of lights from a television in the defendant's apartment.[2] Maynard did not hear any screaming or arguing.

Around the same time, the victim's mother was concerned about the victim's whereabouts. At 2:30 a.m. on August 8, she sent a text message to the victim's cell phone indicating that she had not heard from the victim all day and asking where she was.

Later, during the early morning hours of August 8, Astacio received a call from the defendant after she arrived at work. The defendant informed Astacio that he had "fucked up" and that he and the victim had gotten into an argument during which he "slapped her . . . ." He told Astacio that he was angry at the victim because she had cheated on him. Astacio asked the defendant if she could speak to the victim, and he said that she was sleeping. The defendant then told Astacio that he had to put her on hold because the victim was calling him. When he resumed his conversation with Astacio, the defendant said that the victim could not come to work that day and asked her to make up an excuse for the victim. Astacio stated that she could

not do so, because the victim had just returned from vacation and was needed for the 1 p.m. shift. She asked the defendant to call back at noon and she would "see what [she] could do." The defendant agreed but never called Astacio back.

After this conversation, Astacio attempted to call the victim, eventually reaching Coachman, who still possessed the victim's cell phone. Coachman told Astacio what had occurred at the salon. Coachman then called the victim's parents, who reported to the police that the victim had been kidnapped.

At approximately 9 or 10 a.m. that same day, the defendant met Sease and brought her to Six Flags. At one point while they were at Six Flags, the defendant became upset and exclaimed that he "saw her face" and "she wasn't breathing." When Sease asked the defendant what he was talking about, he stated that "he's not a murder[er]; he's a good person . . . ." The defendant and Sease remained at the park until 10 or 10:30 p.m., when Torchy Colvin, an acquaintance of the defendant, came to pick them up. After returning to Hartford, the defendant, Colvin and Sease "stood outside and just talked and laughed . . . ." The defendant and Sease kissed, and he told her that he wished they had met under different circumstances so that she could be his girlfriend. The defendant told Colvin and Sease that they could take any of his possessions from his house because he was going south to live with family members.

Later that evening, Colvin received a telephone call from the police, who informed her that they were looking for the defendant and the victim. Colvin then drove the defendant to the city of Meriden, leaving the defendant's car at her residence. The defendant told Colvin to lie to the police and tell them that he went to Maine and was driving a different car. On the morning of August 9, the police seized the defendant's car from Colvin's home.

On August 10, 2008, the police executed a search warrant for the defendant's residence. They discovered the victim's body in one of the bedrooms. Blood-like stains were found on a laundry basket in the bedroom, a bath towel and several articles of clothing, including on a pair of denim shorts. One of the victim's "fake nail[s]" was missing, and a fingernail was broken. Subsequent forensic analysis revealed that the defendant's blood was found under the victim's fingernails on her right hand and the pair of denim shorts. In addition, the victim's blood was found in the front passenger side of the defendant's vehicle.

An autopsy revealed that the victim had suffered a variety of injuries, including trauma to the head, scalp, arms, left eye and abdomen, indicative of direct injuries to those areas. The victim also had abrasions on her

neck, consistent with fingernail marks, and evidence of petechial hemorrhaging in the membranes of her eyes and gums. The chief medical examiner concluded that the victim had been strangled and also had suffered blunt force trauma to her head and neck. He also concluded that the victim was alive when these injuries were inflicted. The victim's death was classified as a homicide.

On August 18, 2008, the defendant called the victim's stepfather, Reverend William Baskerville. The conversation lasted between fifteen and ninety seconds. The defendant told Baskerville that he was sorry about "what [he] did to Ashley." He stated that what had happened to the victim was not intentional. The defendant then asked Baskerville to pray for him, and Baskerville replied that he forgave him. Baskerville testified that he was "trying to keep [the defendant] on the line." Baskerville encouraged the defendant to turn himself in to the police, but the defendant did not do so.

The police ultimately found the defendant living under an alias in Mexico. After the defendant was extradited to the United States from Mexico, he provided a sworn statement in which he described the circumstances leading up to the victim's death. He stated that the victim had made him "jealous" and that he pushed her during an argument. He stated that he slapped the victim while they were lying on his bed. When the victim said " 'please, [n]o,' " he said: " '[Y]ou got a man at home to take care of you, why are you runnin[g] around.' " He stated that he "grabbed her by the neck and choked her. I choked and slapped her every time I got mad. I would choke her hard [and] then stop. I would get angry again and continue to choke her." He then said that the victim "got tired and went to bed," and that he slept on the couch. The next morning, the victim would not wake up, but the defendant felt her pulse and thought she was alive. The defendant explained that he then went to Six Flags, and, when he returned, the victim was "barely breathing." The defendant said that he "propped her head up and laid her down in the bed, [but that] she wasn't breathing." He then took off her clothes and "tucked her into bed, just hoping she would wake up." He believed that the victim had died from suffocation. Although it is uncontested that the defendant was the cause of the victim's death, the defendant claimed that the victim's death was accidental.

The state initially charged the defendant in two separate informations. In the first information (Hartford case or charges), the defendant was charged with kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and assault in the third degree in violation of § 53a-61 (a) (1). In the second information (Enfield case or charges), the defendant was charged with murder in violation of § 53a-54a (a), and kidnapping in the second degree in violation of § 53a-94 (a).

On August 26, 2010, the state filed a motion for consolidation of the two informations. The state argued that the cases should be tried together as a matter of judicial economy because the victim was the same in both cases and the victim was with the defendant from the time of her abduction on August 7, 2008, until August 8, 2008. The state also argued at a hearing on August 31, 2010, that the *Boscarino*[3] factors were not present and that the evidence in each case would be cross admissible. The defense contended that the two cases should not be joined because the defendant would be substantially prejudiced, both under the analysis set forth in *Boscarino* and because the evidence would not be cross admissible.

The trial court granted the motion to consolidate because the *Boscarino* factors were not present and evidence of the assault in the Hartford case would be admissible to show intent and motive in the Enfield case. The trial court also indicated that "there [was] some connection between the two [cases]. Something happened on those August dates. We really don't know what happened between Hartford and Enfield. To say that they are absolutely distinct is not necessarily so; it depends on the facts that come across at trial." The trial court assured the defendant that, "[i]f the defense requests instructions, the jury will [be so] instructed."

A jury trial followed. At trial, the state first presented evidence pertaining to the Hartford charges, arguing that the underlying events began on August 7, 2008, at the salon and ended at 777 Maple Avenue. The state then presented evidence pertaining to the Enfield charges, claiming that these events transpired sometime after the defendant and the victim left 777 Maple Avenue. At the conclusion of the trial, the jury found the defendant guilty, with respect to the Hartford charges, of assault in the third degree and the lesser included offense of kidnapping in the second degree. With respect to the Enfield charges, the jury found the defendant guilty of murder and kidnapping in the second degree. The defendant then filed a direct appeal to this court pursuant to General Statutes (Rev. to 2011) § 51-199 (b).[4] Additional facts will be set forth as necessary.

On appeal, the defendant claims that (1) the trial court abused its discretion in granting the state's motion to consolidate the Hartford and Enfield charges for one trial, and (2) there was insufficient evidence to find the defendant guilty of both counts of kidnapping in the second degree. With respect to his consolidation claim, the defendant contends that he was substantially prejudiced as a result of the consolidation. First, the defendant argues that the first and second factors of *Boscarino* are satisfied in the present case because the Hartford charges and the Enfield charges did not involve easily distinguishable factual scenarios, and the murder charged in the Enfield case was brutal and

shocking. The defendant also argues that consolidation was harmful because the evidence was not cross admissible, was not actually admitted for such purposes at trial, and the prejudice was not cured by a limiting instruction. Finally, the defendant argues that there was insufficient evidence to find the defendant guilty of second degree kidnapping in both cases because there was no evidence that the defendant abducted, confined or restrained the victim without her consent.

The state responds that the trial court acted within its discretion in consolidating the Hartford and Enfield charges because the evidence in the cases would be cross admissible in separate trials, and, alternatively, the defendant failed to establish the existence of any of the *Boscarino* factors. The state further contends that the evidence was sufficient to establish that the victim was abducted without her consent in both the Hartford and Enfield cases. We agree with the state that the trial court properly consolidated the Hartford and Enfield charges because the evidence in those cases would have been cross admissible in separate trials. Thus, we do not reach the issue of whether the defendant has established the existence of any of the *Boscarino* factors. We also agree with the state that the evidence was sufficient to support the judgment of conviction of second degree kidnapping in the Hartford case. We conclude, however, that the jury could not reasonably have found that two separate instances of kidnapping occurred because there is insufficient evidence to establish that the victim ever was liberated after her abduction in Hartford. Accordingly, we affirm the judgment of conviction of assault in the third degree and kidnapping in the second degree in the Hartford case, and the judgment of conviction with respect to the murder charge in the Enfield case, but direct the trial court to render judgment of acquittal of second degree kidnapping in the Enfield case.

I

We first determine whether the trial court abused its discretion in consolidating the Hartford and Enfield charges. The defendant argues that he was substantially prejudiced by the consolidation because the first and third *Boscarino* factors were present. In addition, the defendant contends that he was prejudiced because the evidence would not have been cross admissible at separate trials,[5] or, even if the evidence would have been cross admissible, he was prejudiced because it never was admitted for such purposes, and the trial court did not offer a limiting instruction. The state argues that the trial court did not abuse its discretion because the evidence would have been cross admissible, and, alternatively, none of the *Boscarino* factors was present. We agree with the state that the evidence would have been cross admissible. Accordingly, we conclude that the trial court did not abuse its discretion

in consolidating the two informations.[6]

"[I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 158, 51 A.3d 1048 (2012). "[W]hen charges are set forth in separate informations, presumably because they are not of the same character,[7] and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19." (Footnote added.) *State* v. *Payne*, 303 Conn. 538, 549–50, 34 A.3d 370 (2012). On appeal, however, the burden shifts to the defendant "to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . ." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 158.

The defendant may establish that he was substantially prejudiced by showing either that the evidence would not have been cross admissible or that one or more of the *Boscarino*[8] factors were present. "[When] evidence of one incident can be admitted at the trial of the other [incident], separate trials would provide the defendant [with] no significant benefit. . . . [U]nder such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis omitted.) *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987). Accordingly, "[w]e consistently have found joinder to be proper if we have concluded that the evidence of other crimes or uncharged misconduct would have been cross admissible at separate trials." *State* v. *Sanseverino*, 287 Conn. 608, 628–29, 949 A.2d 1156 (2008), superseded in part en banc on other grounds, 291 Conn. 574, 969 A.2d 710 (2009). "[When] evidence is cross admissible, therefore, our inquiry ends." *State* v. *LaFleur*, supra, 307 Conn. 155.

In the present case, the evidence would have been cross admissible in different trials, and, thus, we need not determine whether any of the *Boscarino* factors was present. We first observe that, although it appears that the parties treated the Hartford and Enfield cases as entirely distinct, the conduct giving rise to the charges in these cases constituted a single, unbroken course of conduct. Specifically, over the course of approximately twelve to twenty hours, the same defendant engaged in multiple criminal acts toward the same victim while the victim was continuously in his presence and control.[9] Thus, evidence in the Hartford and Enfield cases would have been cross admissible for two purposes.

First, evidence from these two cases would have been admissible to establish the complete story of what had happened to the victim on August 7 and 8, 2008. "We

have stated that misconduct evidence may be used to complete the story of the charged crime by placing it in the context of nearby and nearly contemporaneous happenings." (Internal quotation marks omitted.) *State v. Ali*, 233 Conn. 403, 427, 660 A.2d 337 (1995). In the present case, the state claimed in its motion for consolidation that the cases should be joined because, inter alia, "the defendant was with the victim from the time of her abduction on August 7, 2008, until the evening of August 8, 2008." In ruling on this motion, the trial court agreed, reasoning that "there is some connection between the two [cases]." The trial court also instructed the jury regarding the use of evidence from both cases to establish the "complete story . . . ."[10] Even defense counsel, during his closing argument, characterized the two cases as "the story of [the defendant] and [the victim] . . . divided into two chapters."

We agree that it is essential to consider the Hartford and Enfield cases together in order to understand the complete story of what had happened to the victim on August 7 and 8, 2008. The entire sequence of events is especially relevant to the two kidnapping charges, because the state bore the burden of establishing two separate instances of abduction in order to prove that two distinct kidnappings had occurred. In fact, as we explain in part II of this opinion, the fact that the victim was continuously in the defendant's presence and control is critical to our sufficiency of the evidence analysis.

Evidence from the Hartford and Enfield cases also would have been cross admissible to establish motive and intent with respect to the murder and two kidnapping charges. "Because of its prejudicial impact, evidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts. . . . On the other hand, such evidence may be offered in proof of an issue in the case, such as intent, identity, malice, motive or a system of criminal activity." (Citations omitted.) *State v. Pollitt*, supra, 205 Conn. 69.

We initially note that evidence of the assault and kidnapping in the Hartford case would have been cross admissible as to the murder charge in the Enfield case to establish the defendant's intent to kill the victim. See, e.g., *State v. Tucker*, 181 Conn. 406, 415–16, 435 A.2d 986 (1980) (concluding that trial court properly admitted evidence of defendant's prior acts of child abuse against murder victim to establish specific intent to murder). In fact, the trial court specifically determined that evidence of the assault in the Hartford case would be admissible to establish intent and motive with respect to the murder charge.

We also observe that, based on the specific facts of the present case, it would have been virtually impossible for the jury to consider evidence of the assault for

improper purposes with respect to the murder charge. Because the defendant conceded that he was responsible for the victim's death, the only real issue in the murder case was whether the defendant intentionally killed the victim. Thus, the jury could not have considered the evidence for an improper purpose, such as propensity for violence, because evidence of the defendant's assault of the victim would have been admissible to prove intent, the only element of the murder charge at issue.

We further conclude that evidence of the murder and second degree kidnapping charges in the Enfield case would have been admissible to establish motive and intent with respect to the first degree kidnapping charge in the Hartford case.[11] In the Hartford case, the defendant was charged with first degree kidnapping and ultimately was found guilty of second degree kidnapping. Both of these crimes require intent. With respect to first degree kidnapping, the state had the burden of proving that the defendant intended to "inflict physical injury upon [the victim]"; General Statutes § 53a-92 (a) (2) (A);[12] and to "prevent his liberation . . . ." General Statutes § 53a-91 (2).[13] In order to prove second degree kidnapping, the state would have to establish that the defendant intended to prevent the victim's liberation. See General Statutes §§ 53a-91 (2) and 53a-94 (a).[14] Evidence of the victim's subsequent murder would certainly be relevant in proving this intent. Specifically, the jury could infer from the victim's murder that the defendant intended to harm the victim and to prevent her liberation when he abducted her from the salon and cut off her access to her car, friend and belongings.

The defendant also contends that he was prejudiced because, even if the evidence *would* have been cross admissible, the evidence was not *actually* admitted for such purposes, and the trial court did not issue any limiting instructions regarding the proper use of such evidence. In support of this contention, the defendant relies on a footnote in *State* v. *Payne*, supra, 303 Conn. 538.[15] We disagree with the defendant's interpretation of *Payne* for several reasons. First and foremost, it is well established that the trial court, in making the discretionary, pretrial decision to join multiple cases, rules on whether the evidence *could* be admissible, not whether the evidence actually *is* admitted. See, e.g., *State* v. *Pollitt*, supra, 205 Conn. 68 ("[when] evidence of one incident *can* be admitted at the trial of the other [incident], separate trials would provide the defendant [with] no significant benefit" [emphasis in original]). Because the decision to join two cases occurs prior to the introduction of evidence, the trial court must make its decision on the basis of potential admissibility rather than what actually transpires at trial. It would not make sense for a reviewing court to overturn the trial court's discretionary, pretrial decision to consolidate solely on the ground that the parties did not ultimately introduce

the evidence at trial. Such a result also would run counter to judicial economy, as the proper remedy for improper joinder is the granting of two new, separate trials, during which the parties ostensibly would be free to introduce the contested evidence in both cases in any event.

Moreover, in the present case, the trial court explicitly informed the defense that it could request a limiting instruction, but the defense did not take advantage of this opportunity. In fact, the defense made significant suggestions and modifications to other aspects of the jury instructions, but it does not appear that it noted or questioned the absence of the instructions that the defendant claims, on appeal, should have been offered.[16] Despite the defendant's failure to request a specific limiting instruction on the proper use of the cross admissible evidence, the trial court did provide the jury with general instructions on the "complete story," motive, and intent. Thus, even if the defendant did suffer any prejudice from joinder of the two cases, the trial court's instructions would have cured any such prejudice.

Finally, the defendant argues that the jury improperly considered the charges cumulatively to determine that the defendant had a general propensity for violence for the following reasons: (1) the jury requested to rehear the chief medical examiner's expert opinion testimony regarding the cause of the victim's death; and (2) the jury found the defendant guilty "on all counts . . . ." This argument has no merit. First, the fact that the jury requested to rehear the chief medical examiner's testimony does not demonstrate that the jury made its decision on the basis of propensity evidence. Rather, it suggests that the jury carefully considered the elements of murder and determined whether the defendant intended to kill the victim on the basis of the evidence as a whole rather than on the fact that the defendant was charged with other crimes. Moreover, although the jury found the defendant guilty "on all counts," the jury found the defendant guilty of the lesser included offense of kidnapping in the second degree in the Hartford case. Thus, the jury evidently was able to separate the charges and not "blindly condemn" the defendant on the basis of his commission of the assault, murder and that portion of the kidnapping that purportedly occurred in Enfield. See *State* v. *Atkinson*, 235 Conn. 748, 766, 670 A.2d 276 (1996) ("by returning a verdict of not guilty on the charge of possession of a weapon in a correctional institution, which also stemmed from the escape incident, the jury evidently was able to separate the two cases and did not blindly condemn the defendant [for] his participation in the murder"). We therefore conclude that the trial court did not abuse its discretion in granting the state's motion to consolidate the Hartford and Enfield charges.

## II

The defendant also claims that the evidence was insufficient to support his convictions of kidnapping in the second degree in both the Hartford and Enfield cases. The state contends that the evidence was sufficient to support both kidnapping convictions. We conclude that the evidence was sufficient to establish that the victim was abducted without her consent from the salon in Hartford. There is insufficient evidence, however, to establish that the victim ever was free from the defendant's control after her initial abduction at the salon. Accordingly, we conclude that there was insufficient evidence to support two separate convictions of kidnapping in the second degree, and, therefore, we reverse the judgment of conviction as to the charge of second degree kidnapping in the Enfield case.

We begin our analysis by examining the relevant statutory text. Section 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person." The term "abduct" is defined in § 53a-91 (2) as "to restrain a person with intent to prevent his liberation by either (A) secreting or holding him a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." Section 53a-91 (1) defines the term "restrain" in relevant part: "[T]o restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ." Section 53a-91 (1) also provides that " 'without consent' means, but is not limited to, (A) deception and (B) any means whatever . . . ."

Thus, "[§] 53a-94 (a), by its plain terms, indisputably prohibits intentional, nonconsensual restraint of a person, by means of physical force, when that restraint is coupled with the intent to prevent that person's liberation." *State* v. *Winot*, 294 Conn. 753, 761, 988 A.2d 188 (2010). "It [also] is clear that the statutory definition of 'restraint' encompasses both movement of a person from one place to another and confinement of a person in the place where a restriction of movement commences." Id. Finally, "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." *State* v. *Salamon*, 287 Conn. 509, 542, 949 A.2d 1092 (2008).

"Kidnapping is a continuing crime." *State* v. *Gomez*, 225 Conn. 347, 351, 622 A.2d 1014 (1993). "Because kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." Id. Thus, "[o]nce the victim [has] been abducted and restrained

with the requisite intent, common sense dictates that the defendant [cannot abduct the victim] again unless at some point [the victim] . . . become[s] free of [the defendant's] control." *State* v. *Freeney*, 228 Conn. 582, 588, 637 A.2d 1088 (1994).

The defendant claims that the evidence was insufficient to support his conviction of kidnapping in the second degree in both the Hartford and Enfield cases. "The standard of review [applicable to] a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009).

In order to establish two separate instances of kidnapping, the state bore the burden of proving that the victim was abducted twice. We thus begin our inquiry with the first abduction, which occurred outside the salon in Hartford. The defendant argues that there was insufficient evidence to support the second degree kidnapping conviction in the Hartford case because there was no evidence that the defendant ever abducted, confined or restrained the victim without her consent. We disagree. The jury reasonably could have inferred that the defendant had restrained the victim with intent to prevent her liberation through the use of physical force when he punched her in the face in his vehicle, drove away from the salon, and punched her a second time as they drove. Although the victim may have voluntarily left the salon and voluntarily entered the defendant's car, it is not unreasonable for the jury to infer that the victim's consent ended when the defendant punched her. The victim then would have been restrained because she was trapped in a moving vehicle.

Other evidence in the record supports the jury's findings of restraint and lack of consent. For instance, the victim left her cell phone with Coachman in the salon. The victim also left her own vehicle in the salon parking lot. The victim's sudden departure left Coachman, a close friend, stranded, without a ride home, and without access to the supplies for her infant son, which were locked in the victim's vehicle. This would be uncharacteristic for the victim, as the jury had heard evidence that the victim was normally punctual and responsible.[17] Finally, the jury could have inferred that the victim would normally inform her mother of her whereabouts, but was unable to do so, from the fact that the victim's mother sent her a text message at 2:30 a.m. on August 8 expressing concern about the victim. We thus conclude that the evidence was sufficient to support the defendant's conviction of second degree kidnapping in the

Hartford case.

In order to establish a second kidnapping, however, the state was required to prove that the victim was liberated after her initial abduction in Hartford. It is well established that, "[b]ecause kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." *State* v. *Gomez*, supra, 225 Conn. 351. Thus, when a victim is kidnapped, the kidnapping ends only after the victim's release or her death. See id. ("[b]ecause the victim . . . was never released, the kidnapping ended only with his death"). The state at times argued that the victim was in the defendant's presence and control continuously from her abduction at the salon until her death,[18] and, because the state failed to prove that there was a break in that continuous presence and control, we conclude that the evidence was insufficient to support a second conviction of kidnapping in the second degree.[19]

We find guidance in our decision in *State* v. *Freeney*, supra, 228 Conn. 582, in which this court concluded that the conviction of the defendant, Burnest Freeney, on two counts of kidnapping arising from a single, continuous incident occurring over the course of twenty-four hours constituted a double jeopardy violation.[20] Id., 585–87, 589. In that case, Freeney and the victim met for the first time at approximately 11:30 p.m. on March 28, 1991. Id., 585. Later that evening, Freeney became hostile and informed the victim that she was his "prostitute." Id., 585–86. Over the course of the night and following morning, the victim was sexually abused by Freeney and other men. Id., 586. Throughout this time, the victim was either in Freeney's presence or locked in her apartment, from which she did not attempt to escape. See id. At around 10 a.m. the next morning, a friend of the victim saw the victim and asked her if "anything was wrong." Id., 587. The victim said: "[N]othing." (Internal quotation marks omitted.) Id. Freeney then pulled the victim toward him, stated that she "was not going anywhere," and brought her back to her apartment. Id. The victim's friend later came to the apartment and distracted Freeney in order to allow the victim to escape. Id.

Freeney was convicted of, inter alia, two counts of kidnapping in the first degree. Id., 583. On appeal, the state conceded that Freeney's "conviction and sentencing for the second count of kidnapping violate[d] the prohibition against double jeopardy . . . ." Id., 587. The court agreed, explaining: "Because the facts clearly demonstrate[d] that the victim was continually restrained after her abduction and was abducted with only one intent, to violate or abuse her sexually, the defendant committed only one crime of kidnapping." Id., 588.

Although the present case does not require this court to engage in a double jeopardy analysis, the reasoning

in *Freeney* is nevertheless applicable. As in *Freeney*, in which the victim was continually restrained after her abduction, it appears that the victim in the present case was continuously in the defendant's presence and control from the moment of her assault in the salon parking lot until the defendant inflicted the injuries that caused her death. In fact, even the defendant argued, in a different context in his brief,[21] that, "[a]s the jury considered whether . . . a course of conduct logically established beyond a reasonable doubt that kidnappings occurred, it is not at all evident where the boundaries of the two circumstantial cases of kidnapping would have separated in the minds of the jurors with unanimous discipline and clarity."

The only evidence of the victim's location and condition between the abduction in Hartford and the alleged second abduction in Enfield is the fifteen to twenty minutes that she and the defendant spent at 777 Maple Avenue. This evidence does not establish that the victim was free from the defendant's control. The victim arrived at the apartment with bruises on her face and a blood clot in her eye. While at the apartment, the defendant was yelling and visibly upset, claiming that the victim had "disrespected" him and made him "look bad in front of everybody." He also engaged in what must have been threatening physical contact, as his act of "mush[ing]" the victim's head had caused Flores to intervene by positioning himself between the defendant and the victim. After this physical contact, the victim hid in the bathroom and thereafter was uncharacteristically withdrawn, sitting far away from the defendant throughout the visit and not participating in the conversation taking place in the apartment. Flores testified that the victim "was pretty much sitting there with her head down . . . not really interacting with anybody, just sitting there." This description contrasts starkly with descriptions of the victim as "a person [who] kept a smile on her face, was always singing, always mak[ing] jokes, never ha[ving] a sad face."

The defendant claims that the distance between the victim and the defendant upon entering the apartment and the victim's refusal of assistance from Flores indicate that the victim consented to being with the defendant at 777 Maple Avenue. Although the victim trailed behind the defendant when they entered the apartment, that fact suggests that the victim was afraid rather than that she was voluntarily following the defendant. Moreover, the victim's decision to decline Flores' offer of assistance was not, by itself, sufficient to establish that the victim was free from the defendant's control. In *Freeney*, this court determined that there was only one kidnapping even though the victim told a friend that nothing was wrong. See *State* v. *Freeney*, supra, 228 Conn. 587. In the present case, less than one hour had passed since the defendant's assault of the victim in the salon parking lot, the victim was mere yards from

her attacker, and she had visible signs of physical abuse. We thus conclude that her decision to decline Flores' offer of assistance was insufficient to establish that she was outside of the defendant's control at that time.[22] Accordingly, we conclude that the state adduced sufficient evidence at trial to establish only one kidnapping on August 7 and 8, 2008, and that kidnapping ended with the victim's death.

The judgment in Docket No. HHD-CR-09-0150379-T (Enfield case) is reversed with respect to the count of kidnapping in the second degree and the case is remanded with direction to render a judgment of acquittal on that count; the judgment in Docket No. HHD-CR-09-0150379-T is affirmed in all other respects, the judgment in Docket No. HHD-CR-09-0628765-T (Hartford case) is affirmed, and the case is remanded for resentencing in accordance with law on the conviction of murder in Docket No. HHD-CR-09-0150379-T and the conviction of assault in the third degree and kidnapping in the second degree in Docket No. HHD-CR-09-0628765-T.

In this opinion the other justices concurred.

[1] Coachman testified that she heard someone say at that point: "[O]h, shit, he just punched her in her face."

[2] When Maynard saw on the news the following day that the police were searching for the defendant and an African-American woman, he immediately called the police and told them what he had seen.

[3] *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987); see footnote 8 of this opinion.

[4] General Statutes (Rev. to 2011) § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[5] It is unclear whether the defendant has conceded this point. Although the defendant's appellate counsel stated at oral argument before this court that he agreed that the evidence would be cross admissible in separate trials, these statements run counter to the arguments made in the defendant's brief. Because the concession at oral argument may have been inadvertent and is contrary to the arguments set forth in the defendant's brief, we will not treat counsel's statements as a concession in the present case.

[6] Because we conclude that the evidence would have been cross admissible, we do not reach the issue of whether any of the *Boscarino* factors exist. When "evidence is cross admissible . . . our inquiry ends." *State* v. *LaFleur*, 307 Conn. 115, 155, 51 A.3d 1048 (2012).

[7] We observe that, whether charges in multiple informations are of the "same character" is not relevant to our review of a trial court's decision to join two informations pursuant to Practice Book § 41-19. Practice Book § 41-19, which governs the joinder of multiple informations, provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together." Although a predecessor to Practice Book § 41-19 contained a reference to cases of the "same character"; Practice Book (1963) § 492; this language was deleted in 1976. See *State* v. *Payne*, 303 Conn. 538, 546 n.5, 34 A.3d 370 (2012). In contrast, General Statutes § 54-57 still requires a determination of whether charges are of the same character. See General Statutes § 54-57 ("[w]henever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise").

[8] When evidence is not cross admissible, several factors identified in *State* v. *Boscarino*, 204 Conn. 714, 721–24, 529 A.2d 1260 (1987), are used to determine whether the defendant has suffered substantial prejudice. "These

factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 156.

[9] The state presented evidence that the victim was with the defendant at approximately 6 p.m. at the salon, at approximately 7 p.m. at 777 Maple Avenue, and at approximately 2 a.m. at the defendant's apartment, where the victim's body ultimately was found. As we discuss more fully in part II of this opinion, the state bore the burden of establishing that the victim was *not* in the defendant's control during part of this time frame in order to prove that two separate kidnappings had occurred. "Kidnapping is a continuing crime." *State* v. *Gomez*, 225 Conn. 347, 351, 622 A.2d 1014 (1993). "Because kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." Id. Thus, because the state failed to establish that the victim was ever free from the defendant's control, we conclude that the victim was kidnapped until her death.

[10] The trial court instructed the jury in relevant part: "You may find that some evidence applies to more than one count in more than one information. The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity. You must consider each count separately and return a separate verdict for each count. This means that you may reach opposite verdicts on different counts. A decision on one count does not bind your decision on another count. During this trial, there has been some minimal overlap between the Hartford charges and the Enfield charges. *This was introduced only to offer the complete story as presented by the prosecution.* Once again, the charges must be considered separately." (Emphasis added.)

The defendant suggests that the foregoing instruction was "cryptic" and improperly allowed the jury to consider evidence presented in the Hartford case in considering the charges in the Enfield case and vice versa. The defendant also contends that this instruction conflicted with other instructions that may have suggested that the evidence from the two cases should be considered separately.

We disagree. First, it would be artificial to separate entirely the evidence presented in the Hartford and Enfield cases because, as we previously explained, an understanding of what transpired on August 7 and 8, 2008, is essential to a determination of guilt with respect to the murder and two kidnapping charges. Although "evidence of guilt of other crimes is [generally] inadmissible to prove that a defendant is guilty of the crime charged against him . . . [t]he fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161–62, 665 A.2d 63 (1995).

Furthermore, we observe that, even if the trial court's instruction was "cryptic" and incorrectly implied that the jury was required to consider the charges in the Hartford and Enfield cases separately, the ambiguity favored the defendant because the jury would have had less evidence to consider in determining whether the state had established the elements of the murder and kidnapping charges. In fact, although the trial court explicitly informed the defense that it was free to request limiting instructions if it believed that the state was not presenting the cases "distinctly and succinctly," the defense did not do so.

[11] We observe that the trial court did not make an explicit finding regarding the cross admissibility of evidence in the Enfield and Hartford cases. Rather, the trial court stated at the hearing on the motion for consolidation: "[A]lthough [defense counsel] indicate[s] that they are distinct, the state does have to prove intent for the second offense. The first offense, the assault, would be admissible as far as intent, not accidental. It would also be admissible as far as motive." Because this reasoning applies equally as well to the cross admissibility of evidence of the murder in the Enfield case and evidence of the kidnapping in the Hartford case, and because both parties presented arguments at the hearing regarding cross admissibility of evidence in the Enfield and Hartford cases, we assume that the trial court agreed with the state in granting the motion for consolidation and found that evidence in the Enfield case would be cross admissible in the Hartford case to establish motive and intent.

[12] General Statutes § 53a-92 provides in relevant part: "(a) A person is

guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) *inflict physical injury upon him* . . . ." (Emphasis added.)

[13] General Statutes § 53a-91 provides in relevant part: "(2) 'Abduct' means to restrain a person *with intent to prevent his liberation* by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation. . . ." (Emphasis added.)

[14] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

[15] The footnote in *Payne* on which the defendant relies provides in relevant part: "[I]t would be inappropriate to affirm on the basis of cross admissibility [when] . . . the trial court did not admit the evidence for consciousness of guilt, and neglected to instruct the jurors regarding impermissible inferences that could be drawn from joinder of the two cases, such as inferring the defendant's propensity to commit crime. If the parties had been permitted to use the evidence for cross admissible purposes at trial, the trial court would have needed to instruct the jury regarding inferences that could not be drawn from such evidence." *State* v. *Payne*, supra, 303 Conn. 543 n.3.

[16] These facts further distinguish the present case from *Payne*. In *Payne*, the state requested that the trial court instruct the jury on consciousness of guilt, and the trial court declined. See *State* v. *Payne*, Conn. Supreme Court Records & Briefs, September Term, 2011, Defendant's Brief p. 12. In the present case, however, the trial court expressly stated that the evidence regarding the assault in the Hartford case *would* be admissible to prove motive and intent in the Enfield case, and there is no evidence that the state was denied an opportunity to make this argument or that the defense was denied the opportunity to request a limiting instruction on this issue. "It is well established in Connecticut . . . that the trial court generally is not obliged . . . to give a limiting instruction [sua sponte]." *State* v. *Cator*, 256 Conn. 785, 801, 781 A.2d 285 (2001). Cases in which the court has determined that a trial court was obligated to give a limiting instruction generally involve situations in which the defendant requested an instruction and the trial court either declined or agreed but failed to give the requested instruction. See, e.g., *State* v. *Ouellette*, 190 Conn. 84, 89–90, 459 A.2d 1005 (1983) (defendant requested limiting instruction, and trial court indicated that it would give jury instruction but failed to do so).

Moreover, in *Payne*, the trial court granted the state's motion for joinder of a felony murder charge with a jury tampering charge on the ground that none of the *Boscarino* factors was present; see *State* v. *Payne*, supra, 303 Conn. 545, 550–52; but did not decide whether the evidence would be cross admissible. See generally *State* v. *Payne*, Conn. Supreme Court Records & Briefs, supra, Appendix to Defendant's Brief pp. 35–40 (reproduction of trial court's articulation of decision to grant state's motion for joinder in *Payne*). In contrast, the trial court in the present case granted the state's motion for consolidation on the basis of the existence of certain *Boscarino* factors and on cross admissibility grounds. Accordingly, we do not find the reasoning in *Payne* regarding cross admissibility applicable to the present case.

[17] Specifically, Astacio testified: "[The victim] was always twenty minutes early [for work]. She was always the last person to leave work. If they needed her for extra hours, she was always there. I basically always used to tell her you live here, this is your life here, you would never leave this place . . . ."

[18] For instance, in the state's motion for consolidation, the state claimed: "The evidence and the reasonable inferences from the evidence establish that the defendant was with the victim from the time of her abduction on August 7, 2008, until the evening of August 8, 2008."

[19] The defendant contends that there is insufficient evidence to sustain his conviction of second degree kidnapping in the Enfield case because the state did not prove that there was an abduction, restraint or lack of consent. We agree with the defendant that the evidence is insufficient, but for a slightly different reason. As we explain, the evidence is insufficient to establish two separate kidnappings because the state did not prove that the victim ever was liberated after her initial abduction in Hartford.

[20] The defendant does not contend in the present case that his conviction on two counts of kidnapping in the second degree is a double jeopardy violation.

[21] The defendant made this argument in regard to the first *Boscarino* factor, which provides that severance may be necessary to avoid undue prejudice when "[t]he cases . . . [do] not involve discrete, easily distin-

guishable factual scenarios." *State* v. *Boscarino*, supra, 204 Conn. 722–23.

[22] The state contends that the jury reasonably could have inferred that the blood found on the passenger side of the defendant's vehicle indicates that the defendant injured the victim in some way after they left 777 Maple Street. Regardless of when the defendant inflicted the injuries that ultimately resulted in the victim's death, because there is insufficient evidence to establish two separate instances of the defendant's intent to abduct the victim and the victim's lack of consent, we conclude that there was only one continuous kidnapping.

———————————